STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. BOBBY LEVON MAYBERRY, WILLIAM JOHN KESTNER, AND JOHN R. MILLER, DEFENDANTS-APPELLANTS.

Argued May 6 and 7, 1968—Decided July 23, 1968.

414

416

*Mr. Joseph H. Kenney* argued the cause for appellant Bobby Levon Mayberry.

*Mr. William B. Scatchard, Jr.* argued the cause for appellant William John Kestner.

*Mr. Theodore Tarter* argued the cause for appellant John R. Miller.

*Messrs. Rudolph J. Rosselli* and *John P. Jehl,* Assistant Prosecutors, argued the cause for respondent State of New Jersey; *Mr. A. Donald Bigley,* Camden County Prosecutor, attorney.

The opinion of the court was delivered by

JACOBS, J. The defendants were convicted of murder in the first degree with recommendations of life imprisonment and were so sentenced. They appealed to this Court as of right under former *R. R.* 1:2–1(c).

On August 27, 1965 the three defendants drove to a bar located near the Rickshaw Inn, Cherry Hill, New Jersey. Mayberry and Kestner were in a car which had been rented in the name of Elmer Swartwood and Miller was in a car which had been stolen from a parking lot. The three defendants then drove to the Rickshaw Inn in the stolen car. Mayberry and Kestner went into the Inn, leaving Miller outside with the car. Inside the Inn, Mayberry, armed with a revolver, approached Frank Adamucci who was a part owner of the Inn. Kestner had pointed him out to Mayberry and Mayberry pushed Adamucci towards a corridor where they had an argument and a scuffle. In the course thereof, Adamucci was shot and killed by a single bullet from Mayberry's revolver. Mayberry himself suffered a gunshot wound on his finger. As Mayberry ran from the corridor, with his gun drawn, he collided with an attendant and threatened a patron who tried to stop him. There was strong testimony that Kestner also had a gun drawn and aided Mayberry's escape. Both Mayberry and Kestner ran to the waiting car driven by Miller and off they went with lights out. They then transferred to the rented car in which they drove off quickly to Delaware.

On August 30, 1965 Kestner was taken into custody. Later Miller was arrested in Illinois and Mayberry was ar-

rested in Georgia. The three of them were indicted for murder and, after various preliminary steps, they were brought to trial in January 1966. The trial was a lengthy one with the State producing numerous witnesses and the defendants themselves testifying along with witnesses on their own behalf. The State charged that the three defendants were in the process of a planned robbery during which Mayberry killed Adamucci and that the three of them were guilty of murder in the first degree. The claim of the defendants was that Kester and Mayberry had gone to collect a debt which Adamucci owed Kestner, that Adamucci had pushed Mayberry jarring the gun out of his belt, that a tussle for the gun followed, and that the shot from the gun was accidentally fired wounding Mayberry and killing Adamucci. This claim was of course clearly rejected by the jury's finding of murder in the first degree. We have carefully reviewed the extensive testimony and are satisfied that it compellingly supports the State's charge; in any event the defendants do not attack the jury's verdict as against the weight of the evidence and we shall therefore not detail the testimony except insofar as necessary for consideration of the various alleged legal errors set forth in their briefs.

Before the trial began there were various motions, some resulting in pretrial rulings which are claimed as grounds for reversal. They may appropriately be dealt with at this point. All of the defendants unsuccessfully sought a change of venue and Mayberry's brief urges that the pretrial publicity and the refusal to change the venue constituted a denial to the defendant of "due process of law." Although he makes passing mention of the extent of newspaper coverage, he places his main reliance on two surveys which were conducted in November and December 1965. The first consisted of a questionnaire answered by 258 people. The county has a population of approximately 400,000 people. Though most understood from their reading of newspapers that Adamucci had been killed in the course of a robbery, only 50 persons thought that he had been killed by one of the men in custody.

420

In the second survey, 1055 persons were polled and the results were similar to the first although the question as to whether the men in custody were thought to have killed Adamucci had been deliberately omitted.

 The lower court, in denying the motion for change of venue, stated that it had carefully reviewed the newspaper articles and the results of the surveys and was satisfied that there was nothing to indicate that a fair trial could not be had within the county; in its own language: "the court believes that an impartial jury can be obtained from the citizens of this county, and they are not aroused in such a way there could not be a qualified jury to sit as a jury in this case." See *State v. Wise*, 19 *N. J.* 59 (1955); *State v. Ravenell*, 43 *N. J.* 171, 180–181 (1964), *certiorari* denied, 379 *U. S.* 982, 85 *S. Ct.* 690, 13 *L. Ed. 2d* 572 (1965). Nothing in the record would lead us to question the accuracy of this comment or the soundness of the denial of the application for change of venue. The defendants did not exhaust their peremptory challenges and do not make any attack on the *voir dire;* nor do they make any attack on the constituency of the jury which was sequestered at all times during the trial. *Sheppard v. Maxwell*, 384 *U. S.* 333, 86 *S. Ct.* 1507, 16 *L. Ed. 2d* 600 (1966) is cited by the defendants but has no bearing here; there the trial was conducted in an offensive carnival atmosphere whereas here it was conducted in careful and orderly fashion and with full regard for the rights of each of the defendants.

In *State v. Ravenell, supra,* a point of error grounded on the trial court's refusal to change the venue because of pretrial publicity was rejected; it was pointed out that under *State v. Wise, supra,* the test is whether an impartial jury could be obtained from the citizens of the county or whether they had been so aroused as to be disqualified; and the following remarks in the Court's opinion have special pertinency here:

We find nothing in the record before us which would warrant disturbance of the lower court's exercise of its discretion in denying the defendant's motion. No attack is made on the qualification of any of the jurors selected. No complaint is made that any juror was sworn above the defendant's objection and no complaint is made about the latitude afforded on the *voir dire*. The recommendation of life imprisonment tends to negate any suggestion of a situation so inflamed as to impair the defendant's opportunity for a fair and impartial trial. The results of the so-called public opinion survey which the defendant submitted were entirely impersuasive. Only 121 persons, in a county with a population of over half a million, were interrogated and 59 of them declined to make any comment. In no sense could this be said to constitute proof, within the standards set forth in *Wise*, that a fair and impartial trial could not be had before a Union County jury. 43 *N. J.*, at *p.* 181.

Prior to trial the defendants Mayberry and Miller moved for severance under *R. R.* 3:5–7. That rule provides that whenever it appears that a defendant is prejudiced by a joinder of offenses or defendants, the court may in its discretion grant a severance or provide whatever other relief justice requires. At the time of their motions, the defendants presented nothing in support other than the fact of joinder and that some evidence would be admissible only as to a single defendant. In *State v. Manney*, 26 *N. J.* 362, 369 (1958), it was noted that a claim of prejudice under *R. R.* 3:5–7 "cannot be grounded merely upon that eventuality." Of course, where the State contemplates using a confession of one of the defendants which can be binding only against him, there are special considerations and there must be special precautions as detailed in *State v. Young*, 46 *N. J.* 152, 159 (1965). See *Bruton v. United States*, 391 *U. S.* 123, 88 *S. Ct.* 1620, 20 *L. Ed. 2d* 476 (1968).

█ The denial of the motions was well within the proper exercise of the lower court's discretion and furnishes no basis for reversal. However, the defendants urge that because of the denial and the resulting joint trial, certain evidence was admitted which created prejudice beyond the corrective capacity of the limiting instructions which the trial judge admittedly gave during his charge. They place par-

ticular stress on the testimony of Miss Hart who was the defendant Kestner's girl friend. Before the Prosecutor placed her on the stand he advised the court and counsel as to the questions he intended to address to Miss Hart which would relate to statements by Kestner binding on him alone. He stated that he would take pains to avoid reference to Mayberry and Miller and when Miss Hart was on the stand he cautioned her to confine her remarks to Kestner's statements and their relation to him alone.

In response to the Prosecutor's question as to whether Kestner told her what had happened at the Rickshaw Inn, Miss Hart testified as follows: "He told me that he knew an incident—of a holdup that was going to take place and that he went there trying to stop it." She stated that Kestner told her he was at the Rickshaw on the night of the shooting and as to what happened to Adamucci. Her testimony on this score was as follows: "He told me that a man approached him for some money and at that time there was a fight, more like a struggle, and Mr. Adamucci was then shot in the chest." The defendant Kestner contends that Miss Hart's testimony was purely hearsay and inadmissible as against him; he says that it was exculpatory and "completely self-serving." But that is not so, for it was patently disserving in the aspect the State relied upon, notably, his reference to a holdup. As such it was admissible as a declaration against interest. See *Evidence Rule* 63(10); Brooks, *Evidence*, 14 *Rutgers L. Rev.* 390, 414–17 (1960).

Apart from the sufficiency of the limiting instructions, it must be noted that Kestner himself testified on the witness stand that he told Miss Hart that he went to the Rickshaw Inn to stop a holdup although he followed that with the statement that actually "there was no holdup." He was of course subject to full cross examination not only by the State but also by his co-defendants. Both Mayberry and Miller testified and acknowledged their respective presences within and outside the Inn. Mayberry admittedly had the gun which he says went off accidentally during his tussle

with Adamucci. In the light of all of the foregoing, we are satisfied that no prejudicial error resulted from the admission of the quoted testimony by Miss Hart. Similarly, we are satisfied that there was no prejudicial error in the admission of testimony by Miss Barclay which we consider merely incidental in the light of the totality of the evidence in the voluminous record of the case.

Miss Barclay testified that in September 1965 she saw Mayberry in Rossville, Georgia. Mayberry had a splint on the middle finger of his left hand and he asked her if she knew a doctor. He told her he had accidentally shot himself, that he was mixed in with the wrong crowd and that "even murder could be involved." He told her he was divorced; she testified that she would not have seen him if she knew he was still married. The trial judge instructed the jury that it was to disregard Miss Barclay's testimony insofar as it may have indicated anything as to any person other than Mayberry. Mayberry contends that the testimony as to his false statement with regard to his marital status was an improper attack on his character; although the Prosecutor might well have stayed away from the subject, the matter had no real significance and could not have prejudiced the substantive rights of any of the defendants or have influenced the verdict returned by the jury.

The defendant Miller complains about the denial of his application for pretrial inspection of the statements made by the State's witnesses. The motion was determined before *R. R.* 3 :5–11 was broadened and we are not here called upon to deal with the meaning and effect of the rule as broadened. At the time of the motion, the rule precluded pretrial discovery of witnesses' statements. *State v. Johnson,* 28 *N. J.* 133, 143–44 (1958) ; *State v. Cook,* 43 *N. J.* 560, 565–566 (1965). Miller was given pretrial discovery of "all inculpatory statements" made by him to "persons investigating the case and notes and memoranda of such statements made by such investigators." In addition he had the right at the trial itself to call for the production of

prior statements of witnesses against him for use in cross examination. *State v. Hunt,* 25 *N. J.* 514 (1958). In his motion, Miller sought relaxation of the restrictive provisions in *R. R.* 3 :5–11 but he made no showing which would call for such action. His citation of *State v. Farmer,* 45 *N. J.* 520 (1965) is not apt for the circumstances there were exceptional and not at all comparable to those presented here. At the trial witnesses' statements in the Prosecutor's possession were made available within the fair contemplation of *Hunt,* State's witnesses were cross examined fully and we find no prejudice to Miller, Kestner or Mayberry resulting from any of the lower court's rulings relating to pretrial discovery or from any of its rulings during the trial relating to the production of witnesses' statements for purposes of cross examination. *Cf. State v. Trantino,* 44 *N. J.* 358, 363–364 (1965), *certiorari* denied, 382 *U. S.* 993, 86 *S. Ct.* 573, 15 *L. Ed. 2d* 479 (1966).

Miller also complains that he was subjected to a pretrial psychiatric examination by a physician acting on the State's behalf and out of the presence of counsel. In preparation for background testimony under *State v. Mount,* 30 *N. J.* 195 (1959), Miller's counsel had applied for and obtained the appointment of a psychiatrist to examine Miller. In response the State applied for and obtained an order permitting examination of the defendants by a State psychiatrist. Its application was wholly understandable though under the circumstances there would appear to have been no need and perhaps no justification for the exclusion of counsel. The results were never used and Miller expressly acknowledges that "the record reveals no actual prejudice resulting from the psychiatric interview." That being so no constructive purpose would be served by pursuing the question sought to be raised by Miller, but not in issue here, namely, whether *State v. Whitlow,* 45 *N. J.* 3 (1965) should be confined to cases where the defense of insanity has been or is about to be raised.

The defendant Kestner complains that after the shooting he was illegally detained and that incriminating information obtained from him during his detention was improperly received in evidence. Kestner was first approached by the police on August 29, 1965. He was questioned at his motel, then accompanied the police officers to the Prosecutor's office, and then was taken to the Cherry Hill Police headquarters where he remained until September 7, 1965. He was then brought before a magistrate, bail was fixed, and he was committed to the Camden County jail upon his failure to post bail. While he was in Cherry Hill, Kestner told the police that he had possessed a 32.20 revolver and a 7.65 German Mauser and that both guns had been fired at a certain location in Delaware. He drew a map showing the location and gave directions which enabled the police to locate a tree into which Kestner had done his firing and to recover "four spent bullets" and twelve "32.20 caliber casings, empty casings." An expert for the State identified the bullets as having been fired from the same gun which had been used to shoot Adamucci. The murder weapon was never found and Mayberry testified that he threw the gun away "in New Jersey somewhere."

Before the foregoing testimony was introduced, the Prosecutor made an offer of proof, counsel for the defendant Kestner requested that a hearing as to the voluntariness of Kestner's statements be held out of the presence of the jury, and that was done. During the hearing there was considerable testimony by police officers and by Kestner himself bearing on the voluntariness issue. Kestner acknowledged that when the officers approached him he knew they were going to question him about the Adamucci killing. One of the officers testified that he told Kestner at his motel that anything he said would have to be voluntary and of his own free will and he asked whether Kestner would prefer to have his attorney join them. Kestner replied that "that wouldn't be necessary" and that he would answer any questions asked. There was also testimony that Kestner was told shortly

thereafter that he had the right to say or not say anything and that he could have an attorney to which Kestner replied, "I have nothing to hide, if I did, I'd shut up and get myself an attorney."

At the Prosecutor's office during the early morning of August 30th Kestner was again told that he could have an attorney; his reply, according to the police officer's testimony, was "that he was trying to help us, he had nothing to hide, and if he decided he needed an attorney he would let us know." Later, during the same morning, Kestner was taken to Cherry Hill and while there was on various occasions advised as to his constitutional rights. Indeed, one of the police officers testified that the Prosecutor himself had advised Kestner that "if you want a lawyer you can get a lawyer, if you can't afford one, we will get you one." The Prosecutor testified that on August 30th Chief Large reported to him that Kestner had requested that he be taken into "protective custody" by the police. The Prosecutor then spoke with Kestner at Cherry Hill, told him that he didn't have to talk to him or to anybody, that anything he said could be used against him, and that he was entitled to a lawyer if he wanted one. The Prosecutor then asked whether in the face of these warnings Kestner wanted to talk to him and Kestner replied that he did. On the following day Kestner told the Prosecutor that maybe he ought to have a lawyer to which the Prosecutor replied, "You can have any lawyer you want" and handed the telephone directory to him with the comment: "here are the yellow pages of the directory containing all the members of the Camden County bar, and you get any lawyer of your own choosing." Kestner then made several telephone calls but did not retain an attorney.

In his own testimony Kestner stated that he was permitted to make limited telephone calls while at Cherry Hill. He acknowledged that he had spoken with several attorneys and that no one had interfered with his retaining an attorney. He did not suggest that he was indigent or that lack of funds

had anything to do with his failure to retain an attorney. He made no complaint as to his treatment at Cherry Hill although at one point he asked Detective Lieutenant Dann of the State Police to obtain more police officers "as a security measure" since he feared an attempt on his life. Detective Dann conveyed Kestner's request to Chief Jones who stated that he would assign another Cherry Hill police officer and who asked that the State Police also observe conditions at the police station periodically.

There was testimony that while at Cherry Hill Kestner "had pretty much the run of the house" and said he wanted to be kept in protective custody. The Prosecutor testified that Kestner had told him "I don't want out. I don't want out until you get Mayberry and Miller in." After the Civil Liberties Union had indicated some interest in his confinement, Kestner wrote and signed the following statement: "I, William J. Kestner, am presently being held in protective care and have been assured that upon request I shall be without delay released or charged as the Prosecutor completes— his study of all evidence. I have not as of this date 9/6/65 made such a request." In his own testimony Kestner stated that the Prosecutor had asked him to give a statement "explaining that I was being held at my own request." Kestner said he had composed the statement himself.

There was much additional testimony bearing on the nature of Kestner's confinement and the warnings given to him but it need not be detailed here; it was fairly summarized in the trial judge's remarks at the close of the voluntariness hearing. The trial judge noted that the record was replete with testimony that "the defendant was given opportunities to speak to counsel, family, and friends, and the defendant was aware of his undoubted right to refuse to disclose any matter which might incriminate him"; he then made his ruling with the following concluding remarks:

I have had the opportunity to note the demeanor of the various witnesses on the stand, including that of defendant Kestner. He is a person of above normal intelligence, and he has had past contacts

with the police and the Courts, and has had experience with the business world, which leads me to the conclusion that the defendant's will was not overborne; that the statements were made freely and voluntarily, without compulsion or inducement, and that there was an observance of fundamental fairness in the proceedings which precipitated the statements, and at the time the statements were made he was in the protective care of the police at his own request.

Therefore, it is the ruling of the Court that the statements were voluntarily given and are admissible.

We find no merit in Kestner's attack on the trial court's ruling. Even assuming that the information received from Kestner was entitled to all of the protections which surround confessions (*State v. Buffa*, 51 *N. J. Super.* 218, 231 (*App. Div.* 1958), affirmed, 31 *N. J.* 378, *certiorari* denied, 364 *U. S.* 916, 81 *S. Ct.* 279, 5 *L. Ed. 2d* 228 (1960); *cf. State v. Callaghan*, 81 *N. J. Super.* 518, 523 (*App. Div.* 1963)) its admission in evidence was undoubtedly proper. *Miranda v. State of Arizona*, 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed. 2d* 694 (1966) has no applicability since the trial here was completed on February 25, 1966 which was well before the date on which *Miranda* was handed down. See *State v. Rudd*, 49 *N. J.* 310, 315 (1967); *State v. Vigliano*, 50 *N. J.* 51, 69 (1967). Nor does *Escobedo v. State of Illinois*, 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed. 2d* 977 (1964) have any applicability. See *State v. Coleman*, 46 *N. J.* 16, 32 (1965), *certiorari* denied, 383 *U. S.* 950, 86 *S. Ct.* 1210, 16 *L. Ed. 2d* 212 (1966); *State v. Billingsley*, 46 *N. J.* 219, 234 (1966).

In *Escobedo* the accused had been released on a writ of *habeas corpus* obtained by his attorney. He was again picked up at a later date, asked to see his attorney, and was falsely told that his attorney did not want to see him. In fact his attorney had asked and had been denied permission by the police to see him. Without being advised that he was not required to make any statement and without being afforded any opportunity to consult with his lawyer, he was interrogated and his incriminating statement was admitted into evidence. In its opinion the Supreme Court confined its

holding to the facts before it, a situation wholly dissimilar and wholly unrelated to Kestner's situation.

Kestner was well aware and was repeatedly told that he could remain silent and that he was entitled to a lawyer. He was then merely one of many possible suspects and investigation was fully under way. He said he didn't want a lawyer because he had nothing to hide; he told the police that "he himself was not involved but that he had information as to the persons that were involved"; indeed he did give information about Mayberry and Miller, and because of fear that he might be harmed by Mayberry he requested that he be kept in protective custody. He was talkative (*cf. Ballay v. People, Colo.*, 419 *P. 2d* 446, 449 (1966)) and apparently believed that he would help his own situation by giving his selective information. See *State v. McKnight*, 52 *N. J.* 35 (1968). When he had early opportunity to call attorneys he did so, winding up however with the comment, "The hell with it * * * I don't need it." Apparently he had concluded not to pursue the retention of an attorney because he either believed that he did not need one or because he wanted to create the impression with the police that he was not implicated in the crime. In either event, it cannot be said that he was dealt with unfairly or that he was in anywise imposed upon. He thought he would outwit the police and throw the entire responsibility on Mayberry and Miller. That he failed to do so does not raise any constitutional infirmities in his treatment. See *State v. McKnight, supra.*

 The test of voluntariness was the proper one and was properly applied by the trial court. See *State v. Billingsley, supra*, 46 *N. J.*, at *p.* 233; *State v. Fauntleroy*, 36 *N. J.* 379, 387–388 (1962). Kestner makes no complaint as to the manner in which he was dealt with while at Cherry Hill; he had complete freedom to talk with family, friends and counsel; he was given opportunities for release but requested that he remain in protective custody since he feared personal harm; and at no time was he pressed for nor did he give any confession. Surely there is no basis for disagreement

with the trial judge's conclusion that Kestner's will was not overborne, that his statements were made freely and voluntarily, and that there was faithful fulfillment of the pertinent constitutional principle of fundamental fairness. See *State v. Smith,* 32 *N. J.* 501, 540 (1960), *certiorari* denied, 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961).

The defendants contend that the lower court erred in failing to grant a request to charge, submitted by Mayberry, that a specific "intent to steal" was a necessary element of the crime of robbery. After setting forth the pertinent parts of *N. J. S. 2A*:113–1 and 2 the trial judge told the members of the jury that robbery is "the felonious taking of·personal property from the person or custody of another by force or intimidation." See *State v. Butler,* 27 *N. J.* 560, 589 (1958). He stated that for a finding of felony murder there must be a determination that the defendants committed or attempted to commit robbery. An attempt to commit a crime, he said, is an act done "with intent to commit it beyond mere preparation and falling short of its actual commission." He told the jury that to constitute robbery "there must be actual violence or such demonstrations or threats as will create a reasonable apprehension of bodily injury if the victim resists."

With respect to the requirement of intent, the trial judge gave the following instructions: "A specific intent to commit the offense of robbery is an essential element of the crime of a felony murder where the charge is that the accused unlawfully killed another during the perpetration of the crime of robbery * * *. With respect to the crime of robbery, this is a crime with relation to which specific intent must be shown. * * * Intent means a purpose to accomplish something, a resolution, a resolve to do a particular act or to accomplish a certain thing. It is not necessary, however, that witnesses be produced to testify that an accused said he had a certain intent when he engaged in a particular act. Intention may be gathered from all of a person's acts and his conduct and from all that has been said and done at

the particular time and place, and from all of the surrounding circumstances that existed at that time."

The intent to steal was, of course, a necessary element of the crime of robbery (2 *Schlosser, Criminal Laws of New Jersey* § 2143, p. 1062 (*Rev.ed.* 1953)) but the charge adequately conveyed that fact and we are satisfied that the jury could not have been misled. The terms "robbery" and "felonious taking" carried with them the necessary connotations of "theft" and "steal"; in the light of the evidence and the entire charge, the use of the very language embodied in the request could have carried no meaning different from that used by the trial judge. The jury in finding murder in the first degree obviously rejected, as wholly incredible, the story that the defendants were there not to commit a robbery but to collect a debt and that in the course of the collection the shot was fired accidentally. In *People v. Butler*, 65 *Cal.* 2d 569, 55 *Cal. Rptr.* 511, 421 *P.* 2d 703 (1967), a divided court reversed a conviction where the prosecutor, with the trial courts approval, had told the jury that there would be a robbery even if the defendant's actual intent was forcibly to collect a debt. In contrast, the presentation by the prosecutor here was not that the defense, if believed, would not preclude findings of robbery and first degree murder, but rather that the defense was unbelievable and should be discarded in its entirety by the jury as pure fabrication. See *Perkins, Criminal Law* 228 (1957); 2 *Wharton's Criminal Law and Procedure* § 550, p. 250 (*Anderson ed.* 1957); *People v. Gallegos*, 130 *Colo.* 232, 274 *P.* 2d 608, 46 *A. L. R.* 2d 1224 (1954); cf. *State v. Austin*, 60 *Wash.* 2d 227, 373 *P.* 2d 137, 140 (1962); *Tipton v. State*, 23 *Okl. Cr.* 86, 212 *P.* 612, 31 *A. L. R.* 1074 (*Ct. App.* 1923). That undoubtedly was what the jury did; clearly no prejudice can be said to have resulted from the trial court's failure to charge in the form submitted.

The defendants contend that the trial court erred in that, in addition to its charge on felony murder, it also

charged the jury on premeditated murder. The murder indictment was in the usual short form and under it the State could properly proceed on either thesis or both. See *State v. Mathis*, 47 *N. J.* 455, 462 (1966); *State v. Butler*, *supra*, 27 *N. J.*, at *p.* 590. Thus it could properly seek to establish a felony murder (*N. J. S.* 2*A* :113–1) and a "willful, deliberate and premeditated killing" (*N. J. S.* 2*A* :113–2); or, as here, it could seek to establish a felony murder, and if the evidence introduced thereafter during the trial actually presented factual issues as to whether the killing was a felony or nonfelony murder, the jury would properly be instructed as to both. See *State v. Sullivan*, 43 *N. J.* 209, 245 (1964), *certiorari* denied, 382 *U. S.* 990, 86 *S. Ct.* 564, 15 *L. Ed. 2d* 477 (1966).

When the Prosecutor opened before the jury he said that the State would establish felony murder and the State's evidence was unquestionably directed towards that end. At the close of the State's case, the defendants moved for acquittal and Kestner moved additionally for "dismissal of the theory of the count of willful, premeditated murder." Kestner's counsel said that he was not certain, though he had the impression, that the "willful, premeditated and deliberate murder theory has been abandoned by the State." The Prosecutor, in opposing the motions, said: "So far as murder is concerned it could be a double kind of murder. It could be willful, deliberate and premeditated murder, and it could be a felony murder, and I see nothing inconsistent in these two propositions." Continuing, the Prosecutor said: "Under this testimony that we have, Mayberry having gone over to Adamucci, talked to him, pulled him into a corridor, walked him back into a corridor, fired a shot, and came running out of the corridor, in my opinion could be very well considered to be a willful, deliberate and premeditated murder." And continuing further, he detailed the evidence which the State had introduced to establish felony killing, concluding: "Now, if we have a willful, deliberate or premeditated murder, or if we have a robbery murder * * * we have them

as principals and subject to the same punishment, all aiders and abettors."

The trial judge denied the motions for acquittal and in response to an inquiry by Mayberry's counsel as to whether premeditated murder was still in the case the court replied, "as of this time, it is a felony murder." The defendants then proceeded with their evidence and for the first time introduced the story of debt collection and accidental shooting. That evidently satisfied the trial court that, even though the State's thesis on its own case had been felony murder, there was now evidence requiring submission to the jury of both felony and nonfelony murder. When in summation, counsel for Mayberry said that premeditated murder had been ruled out, the Prosecutor properly objected and the court explicitly stated that it had not been ruled out. In his charge, the trial judge submitted to the jury both felony murder and premeditated murder, along with second degree and manslaughter, and under the circumstances we find no error in this regard. See *State v. Sullivan, supra,* 43 *N. J.,* at *p.* 245. Indeed it appears to us that the trial court's treatment of the subject could not, in any event, have prejudiced the defendants in view of the jury's undoubted rejection of their story of debt collection and accidental shooting in the course thereof.

The defendants attack several of the trial court's evidential rulings which, however, in our view present no prejudicial error. The State called Mr. John Brady as an expert witness. He testified that he was Chief Chemist and Toxicologist for the New Jersey State Police and that he had testified extensively in court proceedings. He had examined Adamucci's clothing and testified as to the type of blood and powder burns found thereon. He had examined Adamucci's shoes and stated that there were striation marks which were indicative of violent agitation. There was an objection to this testimony which was overruled by the trial judge. Mr. Brady had participated in many homicide investigations and his experience was sufficient to satisfy the little expertise

required for the expression of his opinion that the striation marks on the shoes were "typical of the markings you find in a struggle." Indeed this supported Mayberry's testimony that there had been a struggle and it was clearly nonprejudicial. Surely there was no showing of the "manifest error and injustice" required for our interference with the trial court's exercise of its discretion in the premises. See *State v. Ravenell, supra,* 43 *N. J.,* at *p.* 182.

The State called Lloyd Simmons as a witness on its own case. Some of his testimony was given haltingly and there were leading questions. He was Mayberry's brother-in-law and had driven Mayberry to Georgia after the killing. He had seen Mayberry's bandaged finger and he was asked whether he had inquired how the injury occurred. The trial court overruled an objection to the question with the comment, "I think it is highly competent." The witness then answered, "I don't think I did, sir." The witness was cross examined and later, on redirect, was asked whether he had agreed to appear voluntarily or had refused to do so. The reply was obscure and inquiring in nature and at that point the trial judge said: "Now, do you feel, Mr. Simmons, that anything you may say would incriminate you as a result." There was an objection which was overruled and then the witness said that "it might possibly." Later he indicated doubt as to what incrimination meant and finally he did say that he had offered to appear voluntarily.

After Mr. Simmons had concluded his testimony the defendants moved for mistrial. In support of the motion they urged that the Prosecutor had improperly "cross-examined" his own witness, that the trial judge had improperly called the testimony "highly competent" and that the trial judge had improperly injected the matter of self-incrimination. The motion was denied and properly so. The extent of the so-called crossexamination of the witness by the Prosecutor was insignificant, was well within the trial court's discretionary control of the proceedings (*State v. Riley,* 28 *N. J.* 188, 204 (1958), appeal dismissed, 359 *U. S.* 313, 79 *S. Ct.* 891, 3 *L.*

*Ed. 2d* 832 (1959)), and did not prejudice the defendants. Similarly, the trial court's comment that the testimony was "highly competent," though it might well have been omitted, caused no prejudice. Finally, on the issue of self-incrimination the trial judge, believing that the witness had made pertinent inquiry, was simply seeking to advise the witness as to his constitutional rights. The defendants never sought any jury instruction with respect to the matter (*State .v. Fournier,* 91 *N. J. Super.* 477, 480–481 (*App. Div.* 1966)) and were not prejudiced; surely the incident could not have had any material effect on the verdict or the outcome of the case.

As part of its case the State called a tavern owner who had sold Kestner the 32.20 revolver and the German Mauser. He was shown a gun which was marked Exhibit S-26 and was asked how it compared with the 32.20 he had sold to Kestner. He replied that it was the same type, make and caliber but that it was not as new or as dark as the gun he had sold. Mayberry testified that S-26 was "very similar" to the gun he was carrying on the night of the killing. When on cross examination he was shown S-26 and was asked how it compared with his gun he said "it looks just like it." When the State offered S-26 in evidence the defendants objected. In response, the Prosecutor urged that it be received in evidence with proper instructions since it was not intended to be the murder weapon but only "a similar weapon." In overruling the objection, the court instructed the jury that the exhibit was not intended as the gun that was used "because there was testimony to the effect by Mayberry that he did throw the gun away and this was not the gun. There is no question about that."

We find neither error nor prejudice in the admission of S-26 as a gun similar to but not the actual gun used in the killing. See *State v. Barone,* 96 *N. J. L.* 417, 420 (*Sup. Ct.* 1921), affirmed, 98 *N. J. L.* 292 (*E. & A.* 1922); *State v. Fletcher,* 90 *N. J. L.* 722, 723 (*E. & A.* 1917). The defendants suggest that the members of the jury might

have tested the exhibit in the jury room to see whether it was hair-triggered but there is nothing whatever in the record to indicate that they did so. In any event, Mayberry did not at any point suggest that his own gun was hair-triggered and that that accounted for its going off; his own version was "I fell against the wall, and the gun fell on the floor, and we grappled for the gun, and I jerked it away from him, and I shot him. I'm sorry. Oh, I'm sorry. I'm sick to my soul. I didn't mean to kill that man."

The defendant Kestner asserts that the State's proof of attempted robbery was circumstantial rather than direct and was insufficient to satisfy the requirements of *State v. Donohue*, 2 *N. J.* 381 (1949). In *Donohue* the Court expressed the sweeping view that when the State's evidence is circumstantial "all of the circumstances not only must concur to indicate a defendant's guilt but they must also be inconsistent with any other rational conclusion" and they must exclude "every other hypothesis except that of guilt." 2 *N. J.*, at *p.* 390. This broad expression was never applied literally, for if it had been it would have unreasonably defeated many legitimate prosecutions based on circumstantial evidence where it was possible "to devise speculative hypotheses consistent with defendant's innocence." *People v. Sullivan*, 22 *Ill.* 2d 122, 174 *N. E.* 2d 860, 861 (1961).

The formulation found in *Donohue* has been criticized elsewhere (*United States v. Valenti*, 134 *F.* 2d 362, 364 (2 *Cir.* 1943), *certiorari* denied, 319 *U. S.* 761, 63 *S. Ct.* 1317, 87 *L. Ed.* 1712 (1943)) and has been abandoned in our recent opinions. See *State v. Goodman*, 9 *N. J.* 569, 581 (1952); *State v. Dancyger*, 29 *N. J.* 76, 84, *certiorari* denied, 360 *U. S.* 903, 79 *S. Ct.* 1286, 3 *L. Ed.* 2d 1255 (1959); *State v. Fiorello*, 36 *N. J.* 80, 88 (1961), *certiorari* denied, 368 *U. S.* 967, 82 *S. Ct.* 439, 7 *L. Ed.* 2d 396 (1962); *State v. Ray*, 43 *N. J.* 19, 30 (1964); *State v. Billingsley, supra*, 46 *N. J.* 219, 237. It should no longer be cited to us for under the later formulation the proper issue is simply whether the evidence, viewed in its entirety

including the legitimate inferences therefrom, is sufficient to enable a jury to find that the State's charge has been established beyond reasonable doubt. See *State v. Fiorello, supra,* 36 *N. J.* 80; *State v. Ray, supra,* 43 *N. J.* 19. The approach is the same though the testimony is circumstantial rather than direct; indeed in many situations circumstantial evidence may be "more forceful and more persuasive than direct evidence." *State v. Corby,* 28 *N. J.* 106, 119 (1958); *State v. Goodman, supra,* 9 *N. J.* 569, 581. Here the State's evidence with respect to the attempted robbery was obviously more than enough to satisfy the cited cases and we find no rational basis for Kestner's present attack on it. See *State v. Mills,* 51 *N. J.* 277, 287 (1968), petition for *certiorari* filed, 36 *U. S. L. W.* 3486 (U. S. June 12, 1968).

▇▇▇▇▇ The defendants make an attack on the Prosecutor's summation but we find that the attack has no merit. So long as he stays within the evidence and the legitimate inferences therefrom the Prosecutor is entitled to wide latitude in his summation. See *State v. Hill,* 47 *N. J.* 490, 499 (1966); *cf. State v. Reynolds,* 41 *N. J.* 163, 176 (1963), *certiorari* denied, 377 *U. S.* 1000, 84 *S. Ct.* 1930, 1934, 12 *L. Ed. 2d* 1050 (1964); *State v. Bogen,* 13 *N. J.* 137, 140, *certiorari* denied, 346 *U. S.* 825, 74 *S. Ct.* 44, 98 *L. Ed.* 350 (1953). When at the close of the summation the defendants voiced their objections, the court expressed the view that the Prosecutor's remarks did not exceed "fair comment" and we agree. In his charge, the trial judge took pains to instruct the jury that they were to rely solely on their own recollection of the testimony and that they were to disregard any comments by counsel in their respective summations or by the court in its charge which did not coincide with their own recollection. Under all of the circumstances, we are convinced that the relatively insubstantial items complained about not only did not constitute legal error but did not in any event prejudice any substantial rights.

■■ The defendant Miller complains about the court's charge on aiding and abetting and about its refusal to charge on accessory after the fact. The refusal to charge was entirely correct for Miller had never been accused or indicted as an accessory after the fact (*N. J. S.* 2A:85-2) and the issue was not in the case. The charge on aiding and abetting (*N. J. S.* 2A:85-14) was sufficient in the circumstances and could not have failed to convey to the jury the need for criminal knowledge on Miller's part before he could be convicted. Indeed, the very thesis of the State's case against Miller was that he knowingly acted "in concert" with the others in planning the robbery and knowingly acted as the man in the stolen getaway car. The Prosecutor's summation stressed the persuasive circumstances pointing to full knowledge on Miller's part and the summation of Miller's counsel stressed his defense that Miller "didn't know the reason that Bob Mayberry or William Kestner went into that Rickshaw Inn on the night of August the 27th."

In his charge, the trial judge referred appropriately to the presumption of innocence and the requirement of proof beyond a reasonable doubt. He referred to Miller's defense that "he was only there at the request of Kestner and knew nothing about what was going on" and he instructed the jury that each defendant was entitled to have his case considered individually and that "while each participant may be guilty as a principal, he is not necessarily guilty in the same degree." In the course of his discussion of aiding and abetting he stated that, while mere presence at the scene of the crime did not render one a participant, presence without disapproval in conjunction with other circumstances may be sufficient to enable the jury to infer "that he assented thereto, lent to it his countenance and approval, and was thereby aiding and abetting the same."

The trial judge went on to point out that "concerted action" could be proved by circumstantial evidence and that if, as some of the defendants contend, they were in effect "bystanders", they of course could not be found guilty. Later

when the jury asked the trial judge to "reread aiding and abetting" he did so, concluding again with the remarks that concerted action may be established by circumstantial evidence and that if some of the defendants, as they contend, were in effect mere bystanders and did not participate in the crime they could not be found guilty. In the light of all of the foregoing, and the entire record, it appears inconceivable that the jury's verdict was other than a proper finding that the defendant Miller had knowingly aided and abetted in the planned robbery which resulted in the killing of Adamucci.

The defendant Mayberry complains about the trial court's charge on manslaughter but we find no substance to his complaint. The charge defined manslaughter as the unlawful killing of another without malice, either express or implied. See *State v. Brown,* 22 *N. J.* 405, 411 (1956). It then set forth that manslaughter "may be done either voluntarily, upon a sudden heat of anger, or involuntarily in the commission of some unlawful act." In discussing mitigation of the offense, the trial judge charged the jury that if it found beyond reasonable doubt that the defendant did kill the deceased "but that it was done when he had the intention to do less than great bodily harm, and that would necessarily mean less than the intent to kill, the crime is manslaughter." See *State v. Williams,* 29 *N. J.* 27, 36 (1959). The charge as given was entirely favorable to Mayberry; in any event, the jury's finding of murder in the first degree would seem to obviate any suggestion of harm insofar as the form of the manslaughter charge was concerned.

Finally, the defendants complain about the court's comments on the evidence during the course of its charge to the jury. It is well recognized in our State that the trial judge has the right, and oftentimes the duty, to review the testimony and comment upon it, so long as he clearly leaves to the jury, as he did here, the ultimate determination of the facts and the rendering of a just and true verdict on the facts as it finds them. *State v. Laws,* 50 *N. J.* 159, 177

(1967); *State v. Rudd, supra,* 49 *N. J.* 310, 314. After summarizing the testimony of the State's witnesses, the trial judge referred to Kestner's testimony that he did not have a gun and did not know what happened, along with his testimony that Adamucci owed him $1,500 and that he had requested Mayberry to ask Adamucci for the money; to Mayberry's testimony that he acted at Kestner's request and that the shooting was accidental; to Miller's testimony that he was there at the request of Kestner and knew nothing about what was going on; and to the denial by all of the defendants of any intent to commit robbery.

The trial judge cautioned the members of the jury that their understanding of the evidence was controlling; earlier he had told them that they were to disregard any factual statements by counsel in summation or the court in its charge which did not coincide with their own recollection of the testimony in the case. We consider that his charge, viewed in its entirety as it must be, fairly expressed the governing legal principles and fairly submitted the factual issues to the jury for its determination. Notwithstanding any minor imperfections which may have crept into the lengthy proceeding, the defendants clearly had the fair trial which was their due. See *State v. Butler,* 32 *N. J.* 166, 195–196, *certiorari* denied, 362 *U. S.* 984, 80 *S. Ct.* 1074, 4 *L. Ed. 2d* 1019 (1960). They were found guilty on evidence which was legally sufficient and indeed appears from the entire record to have been compelling. We find no just basis for appellate interference with the judgments of conviction entered below and they accordingly are:

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.