**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3514-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

BRANDON K. MOSBY,
a/k/a KYREE B. MOSBY,

    Defendant-Appellant.

_____

> Submitted May 26, 2020 – Decided July 23, 2020
>
> Before Judges Fasciale and Mitterhoff.
>
> On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 15-03-0789.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Al Glimis, Designated Counsel, on the brief).
>
> Gurbir S. Grewal, Attorney General, attorney for respondent (Amanda Gerilyn Schwartz, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Brandon K. Mosby appeals from his convictions by jury and sentences for first-degree murder, in violation of N.J.S.A. 2C:11-3(a)(1) (count one); second-degree possession of a weapon for an unlawful purpose, in violation of N.J.S.A. 2C:39-4(a) (count two); second-degree unlawful possession of a weapon, in violation of N.J.S.A. 2C:39-5(b) (count three); and second-degree certain persons not to have a weapon, in violation of N.J.S.A. 2C:39-7(b)(1) (count seven). Under the same indictment, defendant was also charged with three drug offenses because cocaine was found at the murder scene inside of a jacket believed to belong to defendant. The trial judge severed these charges. After the murder trial, the judge sentenced defendant to a fifty-year prison term, subject to the eighty-five percent period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2, on count one; a concurrent eight-year prison term, subject to a four-year period of parole ineligibility under the Graves Act, N.J.S.A. 2C:43-6, on count three; and a consecutive eight-year prison term, subject to a four-year period of parole ineligibility under the Graves Act, on count seven.[1]

On appeal, defendant raises the following points:

---

[1] Count two was merged with count one.

POINT I

THE TRIAL COURT ERRED IN RULING, WITHOUT CONDUCTING A N.J.R.E. 403 ANALYSIS, THAT DEFENSE USE OF EVIDENCE OF THE VICTIM'S DRUG USE, WOULD "OPEN THE DOOR" TO THE STATE'S INTRODUCTION OF EVIDENCE THAT DEFENDANT POSSESSED DRUGS AT THE TIME OF THE INDICTMENT. THE COURT'S RULING PREVENTED DEFENDANT FROM RAISING A THIRD-PARTY GUILT DEFENSE. U.S. Const. amends. V, VI, AND XIV; N.J. Const. art. I, ¶¶ 1, 10.

POINT II

THE COURT ERRED IN ADMITTING INTO EVIDENCE, CONTRARY TO N.J.R.E. 403, NUMEROUS INSTANCES OF DOMESTIC VIOLENCE AND ASSAULTIVE BEHAVIOR THEREBY DENYING DEFENDANT A FAIR TRIAL.

POINT III

THE STATE COMMITTED PROSECUTORIAL MISCONDUCT WHEN THE PROSECUTOR MISCHARACTERIZED THE DNA FINDINGS IN THIS CASE DEPRIVING DEFENDANT OF DUE PROCESS AND A FAIR TRIAL. U.S. Const. amend. XIV; N.J. Const. art. I, ¶ 10.

POINT IV

THE AGGREGATE SENTENCE OF 58 YEARS WITH [46.5] YEARS WITHOUT PAROLE IS MANIFESTLY EXCESSIVE.

A-3514-17T4

Having reviewed the record and in light of the applicable law, we affirm.

I.

We discern the following facts from the trial testimony. On March 4, 2014, Jewel Williams and her three-year-old son spent part of the day at her godparents' home. Throughout the day, she and defendant, whom she had been dating since June 2013, argued back and forth through texts and phone calls. Eventually, she stopped responding to defendant's calls and ended their relationship. Around 9:45 p.m., she and her son returned to their home in Audubon. They had been living there for a few months, and defendant would often stay with them, but only Williams was listed as a tenant. The landlord Kenneth Phillips and a man named John Carey also lived in the home.

When Williams arrived home on the night of March 4, Carey and Phillips were watching a movie in the living room. Williams and defendant had planned to spend the evening together, but Williams testified that because of their breakup, she advised Phillips not to let anyone in, as she did not want to be bothered. She then retired to her bedroom with her son. Phillips recalled that Williams did not want to be bothered but did not remember her asking him not to let anyone inside. Sometime after Williams went to her room, Phillips

left to visit his girlfriend, leaving behind only Carey, Williams, and Williams' son.

Soon after, while Williams and her son were lying in bed, defendant entered the home and pushed open the door to Williams' bedroom. Williams and defendant began to fight, and defendant expressed that he was angry and wanted to know why Williams had been declining his calls. After a few minutes, while defendant began gathering his belongings, Williams left the room and walked downstairs. Defendant followed, continuing to argue with her, and then walked out the front door. As he was leaving, Williams yelled, "You'll never see us again." Defendant turned back toward the house and pushed open the front door. He reentered the home and moved into the living room, as he began hitting Williams and pulling out her weave.

Meanwhile, Carey had been sitting in the living room, continuing to watch television. As he noticed Williams' son descend the stairs, he told Williams and defendant to stop fighting. Defendant turned to Carey and said, "Do you want to wear this ass whooping?" He and Carey began fighting, although it is unclear who initiated the fight. When Williams told them to stop they refused, so she grabbed her son and ran out of the house. As she ran into

the street, she heard a loud slam, prompting her to turn her attention toward the house. She saw that Carey had hit his head and fallen in the doorway.

Williams kept running and saw a cab, but it drove away before she could make contact. Thereafter, she was almost hit by a dark-colored car, driven by two women. The car stopped, and Williams was able to force herself and her son inside the car. She instructed the driver, "Pull off. Pull off. He has a gun." She later admitted she had never seen a gun but advised the driver otherwise to convince her to drive away. The driver drove first to the nearby Legacy Diner and then to the Collingswood Diner, about 2.46 miles from Williams' home, where she left Williams and her son. Williams had called her son's father, who met them at the diner and drove them home.

When Williams arrived home, she saw that Carey was still lying in the doorway. She called 9-1-1 and told the operator her ex-boyfriend had recently come to her house and "started going crazy." She ran out and did not know what happened but had just returned home and saw "one of the guys that was in the house on the floor." She told the operator that her roommate had let her ex-boyfriend into the house, who then began hitting her. She did not know where her ex-boyfriend had gone or what had happened after she left the house, but she saw that her roommate was lying on the ground, not moving.

6

Not long after Williams hung up the phone, police arrived at the scene and began to investigate, after determining that Carey was deceased. Williams consented to a search of her bedroom, the common areas in the home, and her cell phone. During the search, the police observed "signs of a struggle," as furniture was turned over, and they noted hair and a Carhartt jacket on the floor nearby. They recovered the jacket and three items from inside the jacket: a tube of Blistex lip balm, a government document displaying defendant's name and date of birth, and cocaine.[2] At some point, they also searched Carey's bedroom and discovered drug paraphernalia.[3]

Sometime after midnight, Williams was transported to the Audubon Police Station, where she gave a statement and identified a photograph of defendant as the man who had fought with Carey. Around 3:48 a.m., after obtaining Williams' consent, a detective arranged for Williams to make a recorded call to defendant. During the call, defendant did not admit to hurting Carey, but he asked Williams if she had his jacket because he needed it back.

---

[2] As referenced previously, the drug charges pertaining to the discovery of the cocaine were severed. The jury did not hear about this particular discovery during the murder trial.

[3] The jury did not hear about this discovery, but it is relevant to one of the issues on appeal.

A-3514-17T4

After Williams hung up, defendant called her back. Williams tried to prompt him to admit he had done something wrong, but she was unsuccessful.

Later that day, Dr. Gerald Feigin, the Medical Examiner, performed an autopsy on Carey's body and determined that his death was a homicide caused by a gunshot wound to the chest. He concluded that it was a contact wound, based on his observations of a muzzle imprint and soot surrounding the wound. The bullet specimens removed from Carey's spine were delivered to the Camden County Ballistics Unit, where a firearms and tool mark identification specialist identified one of the fragments as "[a] 38 caliber class discharged metal jacket of an expanding type bullet," a bullet with "the sole purpose of . . . caus[ing] a massive wound channel to cause severe bleeding." An inspection of the Firearms Licensing System showed defendant had never been issued a permit to carry a handgun in New Jersey.

The New Jersey State Police Forensic Serology Unit examined the Carhartt jacket and Blistex tube and swabbed them for DNA. The DNA was sent to the DNA laboratory to be evaluated against buccal swabs taken from defendant. Forensic scientist Christopher Szymkowiak analyzed the DNA and concluded that defendant was a major source of the DNA profile found on the jacket, meaning "there was more than one person in [the] mixture," but

8

defendant had more DNA compared with the others. He further concluded that only one source of DNA was found inside the Blistex tube, defendant was a match to the DNA profile, and "the DNA profile . . . occurs in approximately one in 7.9 billion of the African American population, one in 90 billion of the Caucasian population, and one in 100 billion of the Hispanic population."

Before trial, the judge made two evidentiary rulings that are relevant to this appeal. First, he decided that the State was permitted to offer evidence that defendant engaged in domestic violence in the moments leading up to Carey's death. He determined that the evidence was intrinsic evidence because it explained how "defendant came to interact with [Carey]" and "why . . . Williams fled her residence with her child." Further, it tended to show motive, opportunity, and identity. The judge found that admission of this evidence would not waste time or confuse the issues, and the evidence had "high probative value" because "the overall incident wouldn't make . . . much sense . . . without the whole story that the State maintains occurred here, starting with the interaction between . . . defendant and . . . Williams, his assault of her, . . . causing her to flee, and him to chase, [Carey] to intercede, and . . . defendant to shoot [Carey]." Although the evidence would prejudice

defendant, it was "less severe than what [the jury] otherwise ha[d] to hear in a murder case."

Then, the judge decided that defendant was permitted to offer evidence of drug paraphernalia found in Carey's bedroom and testimony from Phillips that Carey was waiting for a drug delivery on the night of the shooting. However, offering this evidence would allow the State to present evidence that defendant possessed drugs on that night.

The case proceeded to trial, and counts one, two and three were tried first. The State offered testimony from Williams, Phillips, the cab driver, the driver and passenger of the dark-colored car, a friend of defendant, four forensic experts, and seven investigating officers. Phillips, the cab driver, and the two women from the dark-colored car corroborated parts of Williams' story.

One of the State's experts was Szymkowiak, whom the judge accepted as an expert in forensic DNA analysis. Szymkowiak explained to the jury the difference between a match and a source:

> [PROSECUTOR]: Okay. Can you tell us the difference between a match and a source?
>
> [WITNESS]: So when someone matches a DNA profile, they all match at the source level. The difference between a match statement in my

conclusions and a statement where I'll say someone's a source of a profile is based on the statistic.

So when I do the statistical analysis, and I get that number that comes out of it, that number has to reach a certain threshold to where I'll say someone's a source of a profile or just match it.

[PROSECUTOR]: Okay. And what is that threshold?

[WITNESS]: Set threshold is one in seven trillion of the . . . U.S. population.

He further testified that this statistic represents "the chance that a person randomly chosen from the population matches the DNA profile . . . generated." A source statement means that "this person is the only person who left this stain on here," whereas a match statement means it cannot definitively be said that a certain person left the stain.

During the State's summation, the prosecutor discussed Szymkowiak's testimony and argued, "The DNA is clear because the Blistex is a match, right, and it's a match when you look at the . . . statistics. . . . [One] in 7.9 billion African-Americans have this DNA profile." Defense counsel objected, and the judge heard counsel at sidebar:

[DEFENSE COUNSEL]: That's a very typical misrepresentation of the DNA results. The DNA results are a . . . certain number in billion have these DNA --

11

> [PROSECUTOR]: [T]he testimony was this profile occurs in one in seven billion people in the population.
>
> THE COURT: [W]hy don't you just restate it in terms of the way it states it in the report . . . just so we're clear. I mean, what you said was close to it. I'm not going to . . . on the record say you erred, but I think it would be clear to avoid this to do that.

In front of the jury, the prosecutor clarified:

> And what the report says, the DNA profile obtained from the Blistex occurs in [one] in 7.9 billion of the African-American population. Just what I said, okay? [One] in 7.9 billion. The population of the United States Mr. Szymkowiak told you is only 300 million; right? That's an extra three zeros; right? So that's the DNA. And the DNA on the jacket, he's the source. And what's the number for the . . . source threshold? [Seven] trillion, [seven] trillion. He's the source of that DNA.

After the jury returned a guilty verdict on counts one, two, and three, a short trial on count seven was held. The only evidence presented was a stipulation that defendant had a prior conviction for an offense enumerated under N.J.S.A. 2C:39-9. The jury also returned a guilty verdict on count seven.

At defendant's sentencing hearing, the judge determined that "the aggravating factors clearly, convincingly, and substantially outweigh the mitigating factors." He gave "high weight" to aggravating factors three, six,

and nine. With respect to factor three, the risk that defendant will commit another crime, he noted that defendant's response to Carey's attempts to stop an assault on Williams was an "angry physically violent disproportionate response . . . demonstrat[ing] the risk on the part of . . . defendant to commit further such acts." With respect to factor six, the extent of defendant's prior criminal record and the seriousness of prior convictions, he found that defendant had six prior convictions as an adult, one of which was for unlawful possession of a handgun. He did not consider defendant's juvenile and municipal court history. Lastly, with respect to factor nine, the need for deterring defendant, he noted defendant's prior sentencing on three offenses. He declined to consider general deterrence.

The judge then considered mitigating factors, two, three, four, five, eight, nine, and eleven, finding that they did not apply. With respect to factor two, that defendant did not contemplate his conduct would cause or threaten serious harm, he found that any such assertion was merely speculative. With respect to factors three, four, and five, that defendant acted under strong provocation, that there were substantial grounds excusing or justifying his conduct, and that the victim's conduct induced defendant's commission of the crime, the judge found that Carey's attempts to stop defendant from assaulting

Williams did not constitute sufficient provocation. With respect to factors eight and nine, that defendant's conduct was the result of circumstances that were unlikely to reoccur and that defendant's character and attitude indicate he is unlikely to commit another crime, the judge noted defendant's disproportionate response to Carey's actions. Lastly, with respect to factor eleven, that imprisonment would entail excessive hardship on defendant or his dependents, the judge found that any hardship on defendant's family was typical of the hardship any family would face in this situation.

In deciding to order a consecutive sentence on count seven, the judge considered the Yarbough [4] factors. He found that the crimes and their objectives were predominantly independent, as "defendant possessed the gun at the scene and was in violation of the statute in advance of and apart from the shooting." Additionally, the convictions in this matter were numerous. Ultimately, the judge recognized that there can "be no free crime in a system from which punishment shall fit the crime."

## II.

First, we address defendant's arguments with respect to two evidentiary rulings. We afford substantial deference to a trial judge's evidentiary rulings

---

[4] State v. Yarbough, 100 N.J. 627, 643-44 (1985).

and will only reverse for abuse of discretion. State v. Cole, 229 N.J. 430, 449 (2017). "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling "was so wide of the mark that a manifest denial of justice resulted."'" State v. Kuropchak, 221 N.J. 368, 385-86 (2015) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

## A.

We first consider defendant's argument that the judge erred in admitting evidence that defendant assaulted Williams before Carey was shot.

Generally, relevant evidence, that which has "a tendency in reason to prove or disprove any fact of consequence," is admissible, N.J.R.E. 401; N.J.R.E. 402, unless "its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence," N.J.R.E. 403. In addition, "evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition" and may only "be admitted for other purposes, such as proof of motive, opportunity, intent,

15

preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." N.J.R.E. 404(b).

However, intrinsic evidence "is exempt from the strictures of [N.J.R.E.] 404(b) even if it constitutes evidence of uncharged misconduct that would normally fall under [N.J.R.E.] 404(b) because it is not 'evidence of other crimes, wrongs, or acts.'" State v. Rose, 206 N.J. 141, 177 (2011). When considering evidence of uncharged misconduct, "[t]he threshold determination . . . is whether the evidence relates to 'other crimes,' and thus is subject to continued analysis under [N.J.R.E.] 404(b), or whether it is evidence intrinsic to the charged crime, and thus need only satisfy the evidence rules relating to relevancy, most importantly [N.J.R.E.] 403." Id. at 179. Uncharged misconduct is considered intrinsic evidence if it "directly proves the charged offense" or was "performed contemporaneously with the charged crime . . . [and] facilitate[d] the commission of the charged crime." Id. at 180 (quoting United States v. Green, 617 F.3d 233, 248-49 (3d Cir. 2010)). Evidence providing background information is often admissible as intrinsic evidence. See id. at 180-81.

We agree with the judge's reasoning, which focused on the need to provide the jury with context to avoid confusion. Here, the uncharged

misconduct, assaulting Williams, was performed within minutes, maybe seconds, of the shooting and was the immediate cause of Carey's interference, which prompted defendant to shoot him. Without this evidence, the jury would have no understanding of how defendant came to be in the living room and why he began fighting with Carey. To ensure the jury would not misuse the evidence, the judge instructed the jury twice on its proper use, adjusting the language used in Model Jury Charges (Criminal), "Proof of Other Crimes, Wrongs, or Acts (N.J.R.E. 404(b))" (rev. Sept. 12, 2016) to apply to the use of intrinsic evidence. Defendant has not suggested any reason for us to doubt the jurors' ability to properly apply this instruction. See State v. Burns, 192 N.J. 312, 335 (2007) ("One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions.").

Under N.J.R.E. 403, we conclude that admission of this evidence did not confuse or mislead the jurors, rather it assisted them, and it did not cause undue delay, waste of time, or needless presentation of cumulative evidence. Although the evidence was undoubtedly prejudicial to defendant, it was not so unduly prejudicial as to substantially outweigh the probative value to the State. The evidence served a clear purpose that was not merely to suggest defendant had a propensity for violence. Defendant's contention that the judge erred in

17

admitting evidence that the assaults began upstairs and thereby increased the prejudice to him is not persuasive, as it is unlikely that exclusion of part of the testimony regarding the assault would have caused the jury to reach a different verdict.

B.

We next consider defendant's argument that the judge erred in ruling that if defendant offered testimony that Carey possessed drug paraphernalia and was waiting for a drug delivery on the night of the shooting, he opened the door to evidence that he possessed drugs at the same time.

"The constitutional right to present a defense confers on the defendant the right to argue that someone else committed the crime." State v. Fortin, 178 N.J. 540, 590 (2004). Because a defendant need not prove his or her innocence, there is no requirement to prove a certain probability that someone else committed the crime. Id. at 591. "Third-party guilt evidence 'need only be capable of raising a reasonable doubt of [the] defendant's guilt' to warrant its admissibility." Ibid. (quoting State v. Koedatich, 112 N.J. 225, 299 (1988)). However, such evidence must satisfy the Rules of Evidence. Ibid. "[T]here must be 'some link . . . between the third party and the victim or crime,' [that is] 'capable of inducing reasonable' people to regard the evidence

'as bearing upon the State's case.'" Ibid. (second alteration in original) (first quoting Koedatich, 112 N.J. at 300; then quoting State v. Sturdivant, 31 N.J. 165, 179 (1959)).

Defendant and the State both rely on, as did the trial judge, State v. Fortin, in which our Supreme Court affirmed the decision to exclude evidence that a murder victim sold drugs earlier in the day, which precluded the defendant from arguing the victim "was killed in a drug deal gone awry." 178 N.J. at 592. The Court reasoned that "the evidence did not suggest, even inferentially, that [the victim's] drug dealing was connected in any way to her murder." Id. at 593. Although there was evidence that she was generally involved in drug dealing, there was no evidence at the scene of her murder that she was dealing at the time of her death. Id. at 592. Nevertheless, the Court explained that if there had been such evidence, the defendant, who was in close proximity to the murder, "would have fit the profile of the prototypical suspect, and the door would have been opened to his own extensive drug history." Id. at 593.

"The 'opening the door' doctrine is essentially a rule of expanded relevancy and authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) admissible evidence that

generates an issue, or (2) inadmissible evidence admitted by the court over objection." State v. James, 144 N.J. 538, 554 (1996). It "prevent[s] a defendant from successfully excluding from the prosecution's case-in-chief inadmissible evidence and then selectively introducing pieces of this evidence for the defendant's own advantage, without allowing the prosecution to place the evidence in its proper context." Ibid.

Considering the Court's discussion in Fortin, we agree with the judge's analysis here, even though the evidence of defendant's drug possession is directly related to the charges that were severed. Disregarding for a moment defendant's proposed use of the evidence linking Carey to drug use on the night of the shooting, it would appear that defendant's alleged drug possession was in no way relevant to the murder and weapons charges. However, when defendant proposed to offer the drug evidence to show that another party had motive to shoot Carey, his alleged drug possession became relevant.

Under N.J.R.E. 404(b), evidence of another crime is admissible if it meets four elements:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[State v. Cofield, 127 N.J. 328, 338 (1992) (quoting Abraham P. Ordover, Balancing the Presumptions of Guilt and Innocence: Rules 404(b), 608(b) and 609(a), 38 Emory L.J. 135, 160-61 (1989)).]

As discussed above, defendant's alleged drug possession became evidence of motive once he alleged that a drug dealer may have had motive to shoot Carey. Although the drug charges are not "similar in kind" to murder and the weapons charges, we disregard this difference, as the Court has held that "Cofield's second prong . . . need not receive universal application" unless the case at issue "replicate[s] the circumstances in Cofield." State v. Williams, 190 N.J. 114, 131 (2007). The State would have been able to present clear and convincing evidence that defendant possessed the drugs, given that they were found inside the Carhartt jacket along with a government document with defendant's name. Further, defendant was identified as the source of some of the DNA swabbed from the jacket. Finally, we conclude that the probative value would not have been outweighed by the prejudice to defendant. Precluding the State from offering evidence that could have certainly cast doubt on defendant's defense would have unfairly prejudiced the State. In

21

addition, to ensure the jurors understood how to use such evidence, the judge could have instructed them not to consider it as evidence that defendant was more likely to commit a crime.

## III.

Next, we address defendant's argument that the prosecutor committed the "prosecutor's fallacy" when she mischaracterized the DNA expert's testimony during her summation. When reviewing a prosecutor's comments during summation, we consider whether the conduct "substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate the merits of his [or her] defense." State v. Timmendequas, 161 N.J. 515, 575 (1999). "A prosecutor's remarks and actions must at all times be consistent with his or her duty to ensure that justice is achieved." State v. Williams, 113 N.J. 393, 447-48 (1988). However, the prosecutor is not precluded "from making a 'vigorous and forceful presentation of the State's case.'" State v. Ramseur, 106 N.J. 123, 288 (1987) (quoting State v. Bucanis, 26 N.J. 45, 56 (1958)). "[S]o long as he [or she] stays within the evidence and the legitimate inferences therefrom the [p]rosecutor is entitled to wide latitude in his [or her] summation." State v. R.B., 183 N.J. 308, 330 (2005) (quoting State v. Mayberry, 52 N.J. 413, 437 (1968)).

In deciding whether a prosecutor's statement was prejudicial, we "consider (1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Id. at 332-33 (quoting State v. Frost, 158 N.J. 76, 83 (1999)). However, even if a remark was prejudicial, we will only reverse if the error was "of such a nature as to have been clearly capable of producing an unjust result." Id. at 330 (quoting R. 2:10-2). There must be a real possibility that the error "led the jury to a verdict it otherwise might not have reached." Ibid. (quoting State v. Bankston, 63 N.J. 263, 273 (1973)).

The United States Supreme Court has defined the prosecutor's fallacy:

> The prosecutor's fallacy is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample. In other words, if a juror is told the probability a member of the general population would share the same DNA is [one] in 10,000 (random match probability), and he [or she] takes that to mean there is only a [one] in 10,000 chance that someone other than the defendant is the source of the DNA found at the crime scene (source probability), then he [or she] has succumbed to the prosecutor's fallacy. It is further error to equate source probability with probability of guilt, unless there is no explanation other than guilt for a person to be the source of the crime-scene DNA. This faulty reasoning may result in an erroneous statement that, based on a random match probability

of [one] in 10,000, there is a 0.01% chance the defendant is innocent or a 99.99% chance the defendant is guilty.

[McDaniel v. Brown, 558 U.S. 120, 128 (2010) (citation omitted).]

During the State's summation, the prosecutor accurately stated that defendant was the source of DNA found on the Carhartt jacket and a match to the DNA found inside the Blistex tube. She further stated the probability that another African American shared the same profile. Had she stated that the probability represented the chance that someone else was the source of the DNA, there would be greater cause for concern.

However, even if the prosecutor's characterization was incorrect, any error would have been harmless, as defendant was linked to the scene through Williams' testimony, the identification of defendant as the source of DNA found on the Carhartt jacket, and the government document with defendant's name found inside the jacket. Additionally, Szymkowiak testified as to the difference between a match and a source, and the judge instructed the jury that in deciding the facts, they were only permitted to consider the witness testimony and physical evidence presented, not the arguments made during summations.

IV.

Finally, we address defendant's argument that his fifty-eight year sentence is manifestly excessive. We review sentencing decisions for an abuse of discretion and will only reverse if there was "a clear error of judgment or a sentence that 'shocks the judicial conscience.'" State v. Blackmon, 202 N.J. 283, 297 (2010) (quoting State v. Roth, 95 N.J. 334, 364 (1984)).

A.

Defendant appears to dispute the "high weight" given to aggravating factor six, and he suggests there was sufficient evidence to find mitigating factors two, three, and four.

In deciding an appropriate sentence, the judge "must identify any relevant aggravating and mitigating factors set forth at N.J.S.A. 2C:44-1(a) and (b) that apply to the case." State v. Case, 220 N.J. 49, 64 (2014). The judge must consider any mitigating factor brought to his or her attention and find such factor if there is sufficient evidence supporting it. Ibid. When balancing the aggravating and mitigating factors, the judge must engage in a qualitative assessment and assign appropriate weight to each factor. Id. at 65.

We conclude that the judge appropriately considered the proposed aggravating and mitigating factors and explained his reasoning for finding three aggravating factors and no mitigating factors.

We reject defendant's argument that the judge erred in declining to give weight to defendant's non-violent history. Aggravating factor six does not require the judge to consider whether a defendant's criminal history encompasses violent crimes. See N.J.S.A. 2C:44-1(a)(6) ("The extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted[.]"). Here, the judge ignored defendant's juvenile and municipal court history and then noted that defendant had multiple drug offense convictions and one conviction for unlawful possession of a handgun. Although these are non-violent crimes, they are evidence of defendant's criminal history as an adult, which is significant, given he was twenty-seven years old at the time of sentencing in this matter.

We also reject defendant's contentions that there was sufficient evidence of mitigating factors two, three, and four. It is only speculative that defendant did not contemplate harm to Carey, given the circumstances surrounding the shooting and Dr. Feigin's testimony that the gun used to shoot Carey was pressed into his body when it was fired. Further, Carey's efforts to stop

26

defendant from assaulting Williams did not warrant the shooting, especially since there is no evidence that Carey attempted to seriously harm or kill defendant.

Defendant did not receive the maximum sentence for any of his convictions. See N.J.S.A. 2C:11-3(b)(1); N.J.S.A. 2C:43-6(a)(2). Considering the relevant aggravating factors, his sentence does not shock the conscience, and we perceive no reason to disturb the judge's decision.

B.

Defendant argues that the judge erred in imposing a consecutive sentence on count seven, the certain persons offense.

"When multiple sentences of imprisonment are imposed on a defendant for more than one offense, . . . such multiple sentences shall run concurrently or consecutively as the court determines at the time of sentence[.]" N.J.S.A. 2C:44-5(a). Our Supreme Court has created a list of principles to consider when deciding whether to impose a consecutive or concurrent sentence:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;

(3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

(a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors; [and]

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.][5]

[Yarbough, 100 N.J. at 643-44 (footnote omitted).]

We reject defendant's argument that the absence of factors 3(b), (c), and (d) mandated a concurrent sentence. While "there is no statutory mandate that the court impose a consecutive sentence for a certain persons conviction,"

_____

[5] Guideline number six was superseded by a statutory amendment to N.J.S.A. 2C:44-5(a). State v. Carey, 168 N.J. 413, 423 n.1 (2001); see L. 1993, c. 223, § 1.

State v. Lopez, 417 N.J. Super. 34, 37 n.2 (App. Div. 2010), the Yarbough factors are just guidelines, and the judge "retain[s] a fair degree of discretion" in sentencing a defendant. Carey, 168 N.J. at 427. Here, in imposing a consecutive sentence, the judge considered that the crimes and their objectives were predominantly independent, and he recognized that there can "be no free crime in a system from which punishment shall fit the crime." We agree, as neither crime was a prerequisite to carry out the other, and the purposes for criminalizing these acts are plainly distinct.

To the extent we have not addressed defendant's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3514-17T4