**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3934-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

BRANDON M. WASHINGTON,

    Defendant-Appellant.

_____

> Argued March 21, 2022 – Decided August 4, 2022
>
> Before Judges Messano, Rose, and Enright.
>
> On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 17-05-0471.
>
> Robin Kay Lord argued the cause for the appellant.
>
> Jennifer B. Paszkiewicz, Assistant Prosecutor, argued the cause for respondent (LaChia L. Bradshaw, Burlington County Prosecutor, attorney; Nicole Handy, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A gunman shot Mark Peterson and William Matthews during a crowded "Ladies Night" event at the Willingboro VFW Hall. A jury convicted defendant Brandon Washington of two counts of the lesser-included offense of attempted passion/provocation manslaughter. The judge sentenced defendant to two consecutive, maximum ten-year terms of imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Defendant raises the following points on appeal:

POINT I

NUMEROUS, REPEATED, AND EGREGIOUS IDENTIFICATION ISSUES AT TRIAL AMOUNTED TO A DENIAL OF JUSTICE AND RESULTED IN DEFENDANT BEING DEPRIVED OF A FAIR TRIAL.[1]

POINT II

THE PROSECUTOR COMMITTED MISCONDUCT WHEN HE MADE EGREGIOUS COMMENTS DURING SUMMATION THAT IMPROPERLY WATERED DOWN AND REVERSED THE BURDEN OF PROOF.

POINT III

A SERIES OF JURY CHARGE ERRORS DENIED [DEFENDANT] A FAIR TRIAL.

---

[1] We omit the sub-points included within the points raised on appeal.

A-3934-18

POINT IV

THE COURT DENIED DEFEND[AN]T'S CONSTIT[]U[T]IONAL RIGHT TO PRESENT A DEFENSE BY DENYING DEFEND[AN]T'S ABILITY TO ADMIT RELEVANT PHOTOGRAPHIC EXCULPATORY EVIDENCE AT TRIAL.

POINT V

DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE IMPROPER ADMISSION OF BOTH THE JAIL CALL AND THE SLANG EXPERT'S TESTIMONY REGARDING THE CONTENT OF THE JAIL CALL.

POINT VI

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT SENTENCED DEFENDANT TO TWO CONSECUTIVE MAXIMUM NERA TERMS, AMOUNTING TO A MANIFESTLY EXCESSIVE SENTENCE.

POINT VII

THE TRIAL WAS SO PLAGUED BY ERROR THAT THE CUMULATIVE EFFECT OF THOSE ERRORS DENIED DEFENDANT A FAIR TRIAL.

We affirm defendant's convictions but remand for the court to address the overall fairness of the sentence as required by the Court's decision in State v. Torres, 246 N.J. 246 (2021).

A-3934-18

The sole issue at trial was whether, despite being identified by several witnesses out-of-court and in-court, defendant was the gunman who on February 16, 2017, fired shots inside the VFW hall crowded with more than 150 people. We summarize some of the relevant trial testimony.

Mark Peterson, a member of the VFW, assisted by Timothy Scott, III (Scott III), the bar manager, and Timothy Scott, Jr. (Scott Jr.), Scott III's father and bar chairman, worked security at the front desk collecting a cover charge, checking identification, watching patrons sign the club logbook, and checking patrons for weapons using a metal detector wand. Peterson recognized defendant because he had been in the VFW before. He checked defendant for weapons and watched him sign the logbook, "Brandon," without a surname. Scott, Jr. also saw defendant enter the VFW. Scott III first interacted with defendant at the door when defendant claimed he had already paid the cover charge but had no "wristband." All three testified defendant had a beard and wore eyeglasses and a black fur coat.

Sometime around 11:15 p.m., Christa Hardy, a patron seated at the bar, received a text message from a friend asking who was at the VFW. Hardy took a very short video of the bar area on her cell phone and sent it to her friend at

11:26 p.m. The video was played for the jury. It depicts a Black man with a beard seated directly across from Hardy wearing a black coat, dark rimmed eyeglasses, and a hat. Hardy did not know the man depicted in the video and was never asked to identify defendant at trial.

Sometime shortly before 11:30 p.m., Scott Jr. saw defendant leaning against a wall blocking the hallway. He asked William Matthews, who was working security, "to . . . ask [him] to get . . . off the wall." Matthews also recognized defendant from having seen him in the VFW on four or five prior occasions. Matthews described defendant as an Black male, who had no facial hair and was not wearing eyeglasses. Matthews and defendant got into a verbal confrontation.

Scott III approached hoping to "diffuse the situation." Defendant responded with hostility, and when Scott III told defendant to leave, defendant "chest bump[ed]" him and reached under his coat. Matthews grabbed defendant's arm, placed him in a "choke hold," and walked him backwards out the door, where both men fell to the ground. Matthews got up first and returned to the hall.

Seconds later, the door "[flew] open," defendant stepped into the doorway, pulled a "pistol from his waistband," and began firing. Matthews, who "caught

A-3934-18

a look" at defendant before being shot, fell back onto Peterson, knocking him to the floor. Peterson, who observed the altercation, said he looked "straight" at defendant's face before defendant shot him and exited through the door toward the parking lot.

Pandemonium ensued inside the VFW hall. Police officers were dispatched at 11:29 p.m. and responded within minutes. The jury saw the body camera footage of Willingboro Police Officer Jesus Serrano, the first officer inside the VFW hall. The chaos was apparent, and Serrano attended to Matthews and Peterson until medical personnel arrived. Peterson suffered a gunshot wound to his right arm. Matthews suffered a gunshot wound to his left hand and his head; fortunately, there was no "intracranial penetration" by the bullet.

Seeing several cars leaving the area at rapid speed, police blocked their egress and began checking the identification of the drivers. A VFW patron, Gerald Hines, went to his car to leave. He saw the shooter outside placing something in a silver SUV and then walking to a neighboring yard. Hines then saw the man get into a gray Cadillac, which drove away behind the SUV. Hines called 911, said the Cadillac had a temporary license and provided a partial number. He told the operator the shooter wore a fur coat and was a passenger

6

in the car. During the 911 call, which was played for the jury, Hines told the operator police stopped the SUV but failed to stop the Cadillac.[2]

Willingboro Police Officer Elijah Hart and Detective Brandin Whitham also responded to the VFW hall. They stopped vehicles leaving the scene, checked drivers' identifications, and, in one instance, conducted a "felony stop," ordering the car's occupants out of the vehicle. Police failed to apprehend either the gunman or the weapon used in the shooting.

Officer Hart eventually entered the VFW hall. He testified Scott III approached him and showed Hart a photo on his cellphone from a Facebook post. It was a picture, S-14, of defendant and another man, Mansfield Johnson, a/k/a "Money Mike." Defendant was not wearing glasses in the photo, which was shown to the jury.

Scott III thought a VFW bartender who was not present on the night of the shooting texted the photo to Victoria Hendrix, who was tending bar the night of the shooting, and Hendrix then sent it to him. Scott III "automatically" recognized defendant as one of the men in the photo and had "[n]o doubt" defendant shot Peterson and Matthews. Scott III said he showed the photo to

---

[2] Hines identified defendant as the shooter for the first time in court during re-direct examination.

A-3934-18

his father — something Scott Jr. denied during his testimony— and Officer Hart, but he did not remember showing it to anyone else.

Hart testified no other patrons showed him photographs at the VFW hall, nor did he see any officers showing photographs to patrons. However, a three-second portion of Hart's body camera footage, which was played for the jury, apparently contained Scott III telling Hart an unidentified officer "was showing pictures" to patrons at the VFW hall.[3]

Although disputed by defendant, Detective Whitham recognized defendant as the man in Hardy's cell phone video sitting at the bar wearing dark framed eyeglasses. Whitham had Officer James Benedict conduct a social media search, and Benedict located defendant's social media profile and showed it to Whitham. Whitham said Benedict did not show any photos to others in the VFW.

Defendant tried to impeach this claim. Whitham said his body camera was not on while he was at the VFW hall because the battery died. But a portion of Benedict's body camera video was played for the jury. It showed Whitham

---

[3] This video footage was not included in the appellate record, despite the Clerk's Office request that all video and photographic evidence identified at trial be filed with the court.

A-3934-18

looking at Benedict's cell phone and telling Benedict to shut off his body camera "for a conference."[4]

Benedict admitted that he showed S-14 to Whitham and may have also shown it to an unidentified "female," but he did not recall showing it to anyone else. Benedict also identified body camera footage showing the driver of a vehicle Benedict stopped as it left the VFW hall. The jury saw the image of a Black man behind the wheel wearing dark eyeglasses and a hat. Benedict acknowledged taking down the driver's identification; it was not defendant.

During a walk-through of the scene at approximately 2:00 a.m., Joseph Cordoma, a detective with the Burlington County Prosecutor's office, collected a pair of black-framed Chanel designer non-prescription eyeglasses on a bar table near the entrance doorway. Cordoma said they matched the description he received of eyeglasses worn by the shooter. DNA testing by the State Police Lab revealed defendant as the source of the major DNA profile on the eyeglasses. A minor DNA profile obtained from the glasses did not meet the criteria for statistical analysis, and therefore the lab could not make a comparison for potential contributors.

---

[4] Benedict's body camera footage also was not filed with the court.

Christine Oliveira, a Facebook employee, testified defendant uploaded a picture on his account twelve days before the shootings. In the picture, D-11, defendant was wearing black framed eyeglasses and a red-white-and-blue jacket with stars on its sleeves.[5]

At the police station later the night of the shooting, Police Officer Curtis Hankey conducted photographic arrays, showing six photographs to several witnesses in accordance with the Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures. Hendrix selected defendant's photo from the array, said she knew defendant from the VFW, and indicated she was "certain" in her identification. In court, Hendrix identified defendant as the shooter, but she did not recall sending S-14 to Scott III. Hendrix identified Mansfield Johnson as the man depicted with defendant in S-14.

Scott Jr. also selected defendant's photo when Hankey conducted a photographic array with him. Scott Jr. said he knew defendant from the VFW and was "99%" certain of his identification. He admitted glancing at a photograph of defendant at the VFW before he viewed the array but said it did

---

[5]  Oliveira also identified several other pictures as having been uploaded by defendant but did not testify as to the source of S-14, the Facebook picture sent to Scott III.

A-3934-18

not influence his subsequent selection because he "didn't really get a good look at the photograph" and had no doubt that defendant was the shooter.[6]

Two other witnesses, Jason Gavon, a bartender, and Anthony Hall, a VFW worker, were shown a photo array that contained defendant's photo but were unable to make an identification. Neither testified at trial.

Detective Melvin Rogers of the Burlington County Prosecutor's Office conducted a photo identification with Peterson while he was in the hospital after the shooting. Peterson selected defendant's photo with a high degree of certainty. Peterson said his daughter, who was not in the VFW that night, visited him in the hospital and told him she thought she knew who shot him, but she did not show him any photographs. Peterson acknowledged having some discussion with Matthews, who was in the same room at the hospital.

Matthews was not asked to make a photographic identification at the hospital. Contrary to others, he told police the shooter was wearing a "blue, red and white . . . sweat jacket type," which "seemed like a hoodie type style."

---

[6] Additionally, Hardy, who took the cell phone video of the bar and did not identify defendant, testified that while she was at the police station, Peterson's daughter, who was not at the VFW that night, said she had a photograph, presumably of the suspect, texted to her. Hardy testified that Scott Jr. told her not to look at the photo, so she did not.

After his arrest and during his incarceration in the Burlington County Jail, defendant called "Money," who was Mansfield Johnson. The call was recorded and played for the jury. Defendant asked Money if he still had "wifey," because he heard the police had found it. Money responded that he still had "wifey," and the police did not find that "jawn." The State qualified Whitham as an expert in "slang"; he explained the term "wifey" referred to handguns or firearms, and "jawn" referred to "narcotics, weapons or anything" people were trying to conceal from identification.

Brian Miller, the lead detective for the prosecutor's office, testified that because the trial was adjourned multiple times, together with the trial prosecutor, he prepared witnesses for trial at least three times. Miller acknowledged showing some witnesses the photograph they previously selected from the photographic array, but he was not aware of any witnesses being shown a Facebook photo of defendant before they identified him using a photo array.

Although defendant elected not to testify, he called several witnesses. Robert Welch, a sergeant with the Willingboro Police Department, identified footage from his body camera on the night of the shooting in which he can be heard telling two other officers that a police officer was in the VFW hall showing Facebook photographs to potential witnesses. Welch can be heard saying the

reliability of any witness's subsequent identification would be "null and void" as a result. Welch, however, did not see anyone showing Facebook photographs to others at the VFW hall.

Jeremy Anderson, a patrolman with the Willingboro Police Department, testified that he stopped several vehicles leaving the VFW, including a vehicle driven by Alamin Cruz with Brandon Cain as its passenger. Cruz's name appeared in the VFW sign-in logbook immediately after the name "Brandon." The implication was that defendant never signed the logbook and was not in the VFW hall on the night of the shooting. Anderson admitted stopping several men with beards and eyeglasses as they drove out of the VFW that night, but he did not remember any of them wearing a fur coat.

## II.

In Point I, defendant argues the identifications made by Peterson, Scott Jr., Scott III, Hendricks, and Matthews, were tainted by the dissemination of S-14, the Facebook photograph of defendant, and again tainted by the prosecutor during trial preparation. He further argues, as plain error, that the pretrial preparation sessions were identification procedures subject to the recordation requirements of Rule 3:11.

13

A.

Three witnesses — Peterson, Hendrix, and Scott Jr. — identified defendant's photograph from an array and subsequently identified him in court. Two witnesses — Scott III and Matthews — identified defendant for the first time at trial.[7] Defendant did not move for a pretrial hearing to suppress the out-of-court identifications pursuant to United States v. Wade, 388 U.S. 218 (1967), and State v. Henderson, 208 N.J. 208 (2011), nor did he move for a pretrial hearing under State v. Chen, 208 N.J. 307 (2011), to contest the identification evidence based on witnesses purportedly viewing the Facebook photograph of defendant, S-14.

The issue first arose on the third day of trial, when defendant moved to bar Scott III from testifying because his name was not on the State's witness list. The State maintained the omission was simply an oversight, given the father and son had the same name, and because both men resided at the same address. The prosecutor argued Scott III's name was mentioned throughout discovery furnished to defendant and proffered Scott III would identify and testify about the Facebook photo he showed Officer Hart at the VFW hall the night of the shooting.

---

[7] Defendant does not contest Hines' identification at trial.

The judge ordered a hearing pursuant to N.J.R.E. 104 at which Hart and Scott III testified. Scott III not only identified S-14 as the Facebook photograph sent to him the night of the shooting, but also identified defendant in court as the shooter.

At the conclusion of testimony, defendant argued the judge should bar Scott III as a witness, due to surprise and because his identification was tainted by having seen the Facebook photo. Counsel moved for a <u>Wade</u> hearing and sought to question Hendrix, who purportedly sent the photograph to Scott III. Defense counsel also noted that after the Facebook photo was circulated, Scott Jr., Hendricks, and Peterson identified defendant's photo from an array, but she did not specifically request a <u>Wade</u> hearing as to their identifications. The prosecutor countered that the State provided the Facebook photo and documentation regarding Hart's receipt of the photo from Scott III in discovery.

The judge denied defendant's request for a further hearing. He concluded because the hearing held was not a <u>Wade</u> hearing in the traditional sense, he was not concerned with "system variables." Nevertheless, he considered "the estimator variables which assess the quality of the identification being made by the proposed witness." The judge found Scott III first encountered defendant at the entrance to the VFW, observed defendant on at least two prior occasions,

15

was able to get a good look at defendant during the altercation, and was not under the influence. The judge found Scott III "had sufficient opportunity to view the incident and his degree of attention . . . was exceptional." He noted Scott III had a high level of certainty regarding the identification. The judge permitted Scott III to testify about his receipt of the Facebook photo of defendant with Mansfield Johnson, S-14, and to identify defendant in court as the shooter.

B.

Defendant contends the circulation of defendant's Facebook photo among potential witnesses prior to their out-of-court and in-court identifications of defendant required the judge to conduct a "full Wade/Chen" hearing. We disagree.

A trial court may hold a Wade/Henderson hearing pursuant to N.J.R.E. 104(a) to determine whether a pretrial eyewitness identification was properly conducted and thus admissible under N.J.R.E. 803(a)(3), and whether the prior out-of-court identification was so impermissibly suggestive as to taint any in-court identification. "[R]eliability is the linchpin in determining the admissibility of identification testimony." State v. Herrera, 187 N.J. 493, 503 (2006) (quoting Manson v. Brathwaite, 432 U.S. 98, 114 (1977)). The requirements for determining whether a defendant is entitled to an evidentiary

hearing are set forth in Henderson, 208 N.J. at 288–89 (identifications involving police action), and Chen, 208 N.J. at 327 (identifications involving private action).

To obtain a hearing under the Henderson legal framework, "a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification," tied to a "system . . . variable."  Henderson, 208 N.J. at 288–89.  "System variables" are "variables within the State's control," and include, for example, "[p]re-identification [i]nstructions" and "[s]howups."  Id. at 248, 250, 259–61.  "[E]stimator variables are factors beyond the control of the criminal justice system," and "can include factors related to the incident, the witness, or the perpetrator."  Id. at 261.

If a defendant makes a threshold showing, the burden shifts to the State to "offer proof . . . that the proffered eyewitness identification is reliable — accounting for system and estimator variables."  Id. at 289.  At the hearing, "the ultimate burden remains on the defendant to prove a very substantial likelihood of irreparable misidentification."  Id. at 289.  "[I]f after weighing the evidence presented a court finds from the totality of the circumstances that defendant has demonstrated a very substantial likelihood of irreparable misidentification, the court should suppress the identification evidence."  Ibid.

A-3934-18

In <u>Chen</u>, the Court modified the approach to assess the admissibility of identification evidence when there is suggestive behavior by private citizens as follows:

> (1) to obtain a pretrial hearing, a defendant must present evidence that the identification was made under <u>highly suggestive</u> circumstances that could lead to a mistaken identification, (2) the State must then offer proof to show that the proffered eyewitness identification is reliable, accounting for system and estimator variables, and (3) defendant has the burden of showing a very substantial likelihood of irreparable misidentification. To reiterate, only the first prong is modified from the test in <u>Henderson</u>.
>
> [208 N.J. at 327 (emphasis added).]

Under the <u>Chen</u> formulation, "behavior that would trigger a <u>Wade</u> hearing if engaged in by a law enforcement officer would not automatically require a <u>Rule</u> 104 hearing unless the conduct was highly suggestive in its context." <u>Id.</u> at 328. The Court in <u>Chen</u> recognized, as it did in <u>Henderson</u>, "that in most cases, identification evidence will likely be presented to the jury." <u>Ibid.</u> (citing <u>Henderson</u>, 208 N.J. 302–04). "It will remain the jury's task to determine how reliable that evidence is, with the benefit of cross-examination and appropriate jury instructions. In rare cases, however, highly suggestive procedures that so taint the reliability of a witness' identification testimony will bar that evidence altogether." <u>Ibid.</u>

Here, defendant essentially was provided with a <u>Wade/Chen</u> hearing as to Scott III, and any error in denying an additional hearing was harmless. <u>See</u> <u>R.</u> 2:10-2 (any error was not "clearly capable of producing an unjust result"). Defendant never requested a <u>Wade/Chen</u> hearing on the out-of-court identifications made by Hendrix, Peterson, and Scott Jr., claiming only that the Facebook photo was disseminated before these witnesses identified defendant's photo in the array. Even if that statement could be construed as a request for a hearing, defendant cannot establish the threshold justification for the hearing — that the witnesses viewed the photo under "highly suggestive circumstances" — since the witnesses testified they either did not see the photo or were not influenced by it. <u>Chen</u>, 208 N.J. at 327. There was no plain error in failing to conduct a <u>Wade/Chen</u> hearing as to these witnesses.

### C.

Defendant next contends the prosecutor's pretrial preparation sessions with these five witnesses included additional out-of-court, impermissibly suggestive photographic identification procedures that tainted the witnesses' in-court identifications of defendant. Defendant also contends the prosecutor failed to comply with <u>Rule</u> 3:11. However, defendant never requested a hearing on this issue, nor did he move to bar the in-court identifications made by Peterson,

19

Scott Jr., Scott III, and Hendrix because they were tainted during pretrial preparation.  Indeed, the issue first arose only peripherally during Matthews' direct testimony.

Matthews said he recognized the shooter as having come to the VFW hall "maybe four or five times" before.  He generally wore a black furry jacket or a red-white-and-blue "Evel Knievel" jacket.  Matthews had never identified defendant as the shooter and had not identified him in court.

Prior to cross-examination, defense counsel requested a hearing, noting Matthews' prior statement to police indicated the assailant wore a "blue, white and red sweatshirt hoodie type."  Counsel demanded the prosecutor disclose whether Matthews was shown any photographs of defendant during pretrial preparation.  At side bar, the prosecutor stipulated that he showed Matthews during pretrial preparation the Facebook photo of defendant wearing a red-white-and-blue jacket, D-11, but he did not ask Matthews to identify defendant because Matthews could not "identify the person who shot him."  The judge denied defendant's request for a hearing but directed the prosecutor to identify the photographs used during Matthews' trial preparation, which he did.[8]

_____

[8] It is unclear from the record whether there were additional photographs shown to Matthews.

A-3934-18

During cross-examination, counsel showed Matthews D-11, and he said the jacket may have been the one worn by the shooter, but he also said the man in the photo was not the shooter because the shooter had no beard. Despite the prosecutor's stipulation that he showed the photo to Matthews during pretrial preparation, Matthews denied ever seeing it before.

During re-cross examination, defense counsel asked:

> Q. You know the gentleman to my right is not the one who shot you, right?
>
> A. I'm looking at him closely, clearly now. That's the man that shot me right there, ma'am.
>
> Q. And any particular reason why when the prosecutor showed you this photograph that you didn't tell him that? Any particular reason why when the prosecutor mentioned it three other times you didn't tell him that, sir? Any particular reason why throughout the entire course of your direct examination, cross-examination, as you're sitting there on the witness stand, that you elected not to tell this jury that the gentlem[a]n to my right after you saw him in the photograph is the one that shot you?
>
> A. Because that question never came up.

On appeal, defendant argues the prosecutor's trial preparation constituted a pre-trial identification procedure that was impermissibly suggestive and tainted, not just Matthews' in-court identification, but also the in-court

21

identifications made by Peterson, Scott, Jr., and Scott III, all of whom acknowledged being shown a picture of defendant during pre-trial preparation.[9]

We find little merit to defendant's argument as it pertains to Matthews' in-court identification. First-time in-court identifications are admissible under State v. Clausell, 121 N.J. 298, 327 (1990), and Henderson, which addressed suggestive pretrial identification procedures, did not revise that general rule of admissibility. See State v. Guerino, 464 N.J. Super. 589, 605 (App. Div. 2020) (noting the Court rejected an argument that it should "ban all in-court identifications, or . . . restrict in-court identifications to cases where there has been an 'unequivocal' out-of-court identification"); State v. Watson, ___ N.J. Super. ___, ___ (App. Div. 2022) (slip op. at 122) ("Henderson focused almost entirely on out-of-court identification procedures; there is no discussion in the opinion that specifically informs trial courts on whether and when to exclude in-court identifications"). The threshold for the suppression of an in-court

---

[9] Peterson and Scott, Jr. confirmed they were shown the photo array and picture they had previously identified and signed; Scott III acknowledged identifying the Facebook photo, S-14, during pre-trial preparation sessions. Hendrix was not asked whether she saw defendant's photo during pre-trial preparation, although she testified at trial regarding her initial out-of-court identification and was shown the entire array from which she had selected defendant's photo.

identification is high. Guerino, 464 N.J. Super. at 622 (citing Henderson, 208 N.J. at 303).

Matthews never participated in an out-of-court identification procedure during the initial investigation, and, until the prosecutor acknowledged showing Matthews D-11 in an effort to identify the red-white-and-blue jacket, nothing in the record indicates Matthews ever participated in any out-of-court photographic identification procedure. We also accept the prosecutor's representation that Matthews was not asked if the man shown in D-11, i.e., defendant, was the man who shot him.[10] Additionally, Matthews denied ever seeing the picture before, even though the prosecutor stipulated showing it to him. Finally, the prosecutor never asked Matthews to make an in-court identification; defense counsel did.

As to the other three witnesses, the argument has some merit. It is axiomatic that "viewing a suspect more than once during an investigation can affect the reliability of the later identification." Guerino, 464 N.J. Super. at 613 (citing Henderson, 208 N.J. at 255). "Successive views . . . 'can make it difficult to know whether the later identification stems from a memory of the original

_____

[10] We firmly agree with defense counsel that had Matthews failed to identify the man shown in D-11 as the shooter if specifically asked during pretrial preparation, the prosecutor was duty-bound to disclose that exculpatory evidence before trial.

event or a memory of the earlier identification procedure.'" Ibid. (quoting Henderson, 208 N.J. at 255). At the same time, it is well established that a prosecutor has a duty to adequately prepare for trial. In re Segal, 130 N.J. 468, 480 (1992).

The Supreme Court Committees that considered recordation of identification procedures never considered whether the requirement should apply to showing a witness during pretrial preparation a photograph of a defendant that the witness already selected in an out-of-court identification procedure. See Report of the Supreme Court Criminal Practice Committee on Revisions to the Court Rules Addressing Recording Requirements for Out-of-Court Identification Procedures and Addressing the Identification Model Charges (Feb. 2, 2012); Report and Recommendation to the Supreme Court from the Criminal Practice Committee on Rule 3:4-2 (First Appearance) and Rule 3:11 (Out-Of-Court Identification Procedure) (Oct. 28, 2019).

There is sparse authority addressing limitations on a prosecutor's trial preparation of witnesses.[11] In Guerino, we addressed an "unusual event" where

---

[11] The New Jersey Attorney General Directives, New Jersey County Prosecutor Manuals on Ethics, and the American Bar Association Reports, contain no specific guidance on the scope of trial preparation by prosecutors. The National District Attorneys Association, National Prosecution Standards § 2-10.4, at 33

A-3934-18

approximately two weeks before trial the prosecutor asked the victim of a robbery "to come to the courthouse to view a line of county jail inmates who paraded past her as she sat in the hallway outside a courtroom." 464 N.J. Super. at 612. The victim, who had during an earlier photo array indicated she was "only 80% certain the photograph she selected" was of the robber, identified the defendant during the hallway viewing, and then at trial "professed to be 100% certain defendant was the culprit." Id. at 614, 616–17. We remanded for a Wade/ Henderson hearing, finding that the "unusual hallway event must . . . be examined carefully because it bears on the admissibility of the victim's" increased confidence in her identification of the defendant. Id. at 614.

However, in addressing whether the hallway event was an out-of-court identification procedure subject to the recording requirements of Rule 3:11, we said:

> It bears emphasis this was not a situation where the prosecutor met with the victim shortly before trial to refresh her recollection of her prior statements and the selection she made and confidence level she expressed during the photo array procedure. Rather, the hallway event was essentially a new identification procedure,

(3d ed. 2009), https://ndaa.org/wp-content/uploads/NDAA-NPS-3rd-Ed.-w-Revised-Commentary.pdf, provides "[t]he prosecutor shall not advise or assist a witness to testify falsely. The prosecutor may discuss the content, style, and manner of the witness's testimony, but should at all times make efforts to ensure that the witness understands his or her obligation to testify truthfully."

25

reflecting, ostensibly, the prosecutor's efforts to secure a higher confidence level than the one the victim expressed at the conclusion of the photo array procedure.

[Id. at 615 (emphasis added).]

In People v. Marshall, however, the prosecutor showed the victim a photograph of the defendant during trial preparation, which was conducted eighteen months after the incident and the day before a scheduled court appearance. 45 N.E.3d 954, 957 (N.Y. 2015). The Court of Appeals held the trial court erred in denying the defendant's request for a Wade hearing to determine if the display was unduly suggestive, and overruled prior precedent that created an exception to N. Y. Crim. Proc. Law §§ 710.30 (Consol. 2022) (motion to suppress) for identifications made for trial preparation. Id. at 956. However, the court found that such error was harmless because there was support in the record for the trial court's alternative finding of an independent source for the victim's in-court identification of the defendant. Ibid.

In this case, we choose not to decide whether the prosecutor's pretrial preparation of witnesses that included showing a photograph of defendant or photographic array that included a previously identified photo of defendant must be recorded pursuant to Rule 3:11(a). Nor do we on this record decide whether such preparation sessions need be disclosed in discovery, unless, of course, it

26

results in exculpatory evidence, for example, the witness's denial of a prior identification. Defendant had the opportunity to create a more expansive, detailed record in this case, but failed to do so. Even when witnesses acknowledged being shown a previously identified photo during pretrial preparation, and when the State's lead investigator admitted doing the same, defendant never sought a hearing outside the presence of the jury to contest the out-of-court or in-court identifications. We decline to consider such a significant issue on the record presented.

## III.

We address defendant's remaining points, which considered separately or cumulatively do not compel reversal.

## A.

In Point II, defendant contends the prosecutor's summation comments deprived him of a fair trial. Importantly, "[e]very prosecutorial misstep will not warrant a new trial. In this case, as in others, we must measure the prejudicial effect of the prosecutorial excesses against a defendant's fair trial rights." State v. Garcia, 245 N.J. 412, 436 (2021) (citing State v. McNeil-Thomas, 238 N.J. 256, 275 (2019)). "Prosecutorial comments are deemed to have violated the defendant 's right to a fair trial when they 'so infect[] the trial with unfairness as

27

to make the resulting conviction a denial of due process.'" McNeil-Thomas, 238 N.J. at 276 (alteration in original) (quoting State v. Jackson, 211 N.J. 394, 409 (2012)). The prosecutor's comments here did not deny defendant a fair trial.

In addressing a theme of defense counsel's summation, i.e., the police investigation was shoddy and likely allowed the true perpetrator to escape, the prosecutor said: "You have to ask yourself . . . you want to hold the police responsible for making a mistake, absolutely do so. But does that mean that the victims don't get justice?" The judge overruled defense counsel's objection.

Prosecutors should not appeal to the jury's emotions or urge sympathy for the victims of a crime. State v. Timmendequas, 161 N.J. 515, 693 (1999). But "[a] prosecutor is not forced to idly sit as a defense attorney attacks the credibility of the State's witnesses; a response is permitted." State v. Hawk, 327 N.J. Super. 276, 284 (App. Div. 2000) (citing State v. C.H., 264 N.J. Super. 112, 135 (App. Div. 1993)). We do not think the prosecutor's comments here crossed the line.

The judge also overruled defense counsel's objection when the prosecutor said: "A trial is a search, it's a search for the truth." As defendant points out, the Court has instructed judges not to direct a jury to "search for truth" and "avoid 'search[ing] for doubt.'" State v. Medina, 147 N.J. 43, 59 (1996)

(alteration in original). In <u>State v. Purnell</u>, the Court expressed concern over the trial court's use of the term "search for truth" because it could dilute the State's burden of proof, but nonetheless affirmed because the jury had been instructed about the presumption of innocence and the State's burden of proof. 126 N.J. 518, 544–45 (1992); <u>see also</u> <u>State v. Hunt</u>, 115 N.J. 330, 372–73 (1989) (rejecting the defendant's argument that the State's burden of proof was diluted by the court advising jurors of their "duty to determine 'where the truth rests,'" because the judge's instructions clarified the State's burden). Here, the fleeting comment was negated by the judge's comprehensive jury instructions that clearly defined the State's burden of proof.

The judge also overruled another objection by defense counsel to the prosecutor's suggestion to the jury that "[t]o find the defendant not guilty you must also disbelie[ve] all of the State's witnesses." The prosecutor continued, arguing Peterson, Matthews, Hendrix, Scott Jr., Scott III, and Hines, identified defendant as the shooter, and thus to find defendant not guilty, the jury had

> to believe that each of these witnesses weren't telling the truth when they saw the defendant come into the VFW and shoot Mr. Peterson and Mr. Matthews.
>
> . . . .

A-3934-18

And you must believe all of these witnesses, all six of them, were not telling the truth when they made an in-court identification.

Defense counsel objected and requested a curative instruction. The judge overruled the objection, indicated he would charge the jury that the prosecutor's comments were not evidence, and noted he had "heard a two-hour summation from defense counsel and the suggestion was that virtually all of the witnesses were lying."

"It is improper for a prosecutor to express his personal opinion on the veracity of any witness." State v. Rivera, 437 N.J. Super. 434, 463 (App. Div. 2014) (citing State v. Marshall, 123 N.J. 1, 154 (1991)). However, the prosecutor did not vouch for the State's witnesses, and his comments were in direct response to defense counsel's summation comments. See, e.g., State v. Vasquez, 374 N.J. Super. 252, 260–62 (App. Div. 2005) (prosecutor's remarks did not constitute reversible error where they were in response to defense counsel's argument that State's witness either deliberately lied or stretched the truth to obtain a conviction).

## B.

In Point III, defendant argues the judge committed several errors in his jury charge by: 1) failing to follow Model Jury Charges (Criminal), "Prior

Contradictory Statements of Witnesses (Not Defendant)" (approved May 23, 1994) (the Model Charge); 2) presenting the jury with an outline of the charge; 3) failing to include "critical and applicable language in the identification instruction"; and 4) making inappropriate comments during curative instructions thereby compounding the jury charge errors. We consider the arguments, recognizing that "[a]ppropriate and proper charges to a jury are essential for a fair trial." State v. Daniels, 224 N.J. 168, 180 (2016) (citing State v. Savage, 172 N.J. 374, 387 (2002)). "Because proper jury instructions are essential to a fair trial, 'erroneous instructions on material points are presumed to' possess the capacity to unfairly prejudice the defendant." State v. McKinney, 223 N.J. 475, 495 (2015) (quoting State v. Bunch, 180 N.J. 534, 541–42 (2004)). "Failure to honor proper requests will ordinarily be deemed prejudicial error when the subject matter is fundamental and essential or is substantially material to the trial." State v. Green, 86 N.J. 281, 291 (1981).

Under our standard of review, "there must 'be "some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached."'" State v. Baum, 224 N.J. 147, 159 (2016) (alterations in original) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)). "The error must be

considered in light of the entire charge and must be evaluated in light 'of the overall strength of the State's case.'" State v. Galicia, 210 N.J. 364, 388 (2012) (quoting State v. Walker, 203 N.J. 73, 90 (2010)).

Defendant contends the judge's use of his own version of instructions regarding inconsistent statements, rather than the Model Charge, limited the jury to only "three options" in evaluating prior contradictory statements and not a fourth option of concluding the witness was "lying." He also says the judge's charge failed to include any guidance on how the jury could consider assertions made by the witness but omitted in the witness's prior statement. However, although we agree the judge should have followed the Model Charge, any error was harmless. The judge did not limit the jury's ability to evaluate prior contradictory statements and specifically told the jury it could disregard the witness's entire testimony. Additionally, although the judge's charge failed to specifically include omissions within the umbrella of prior contradictions, the charge as given clearly conveyed to the jury its ability to weigh any "discrepancy or inconsistency" in a witness's testimony from prior statements when evaluating credibility.

We also agree providing an outline of the charge to jurors was a mistake. As defendant argues, it failed to include critical elements of the specific crimes

charged. However, before distributing the outline, the judge cautioned the jury that the outline did "not mean that the Court [was] highlighting that aspect of its instructions. Indeed, all of the instructions are of equal importance." Moreover, except as we note, there was no objection to the charge as given or the verdict sheet. See, e.g., State v. Gandhi, 201 N.J. 161, 195–98 (2010) (no reversible error in omission of an element on the verdict sheet where "the oral instructions of a court were sufficient to convey an understanding of the elements to the jury").

Defendant next contends the judge failed to instruct the jury in accordance with the Model Jury Charges (Criminal), "Identification: In-Court And Out-Of-Court Identifications" at 8 (rev. May 18, 2020), that it "may also consider whether the witness did not identify defendant at a prior identification procedure." Defendant claims this portion of the model charge should have been given regarding Scott III's and Matthews' in-court identifications. However, the language was properly omitted because neither participated in an out-of-court identification procedure.

Finally, defendant argues the judge's improvised curative instructions and comments to the jury require reversal. For example, after the judge cautioned the jury before hearing defendant's call from jail that defendant was presumed

innocent, defense counsel said in open court that defendant was in jail "related to these charges," and not some other crime. The judge responded, "Of course it was related to these charges and, quite frankly, it's the seriousness of the charge that would cause his retention without bail. I think most of us could conclude that without having gone to law school." The judge's comments as to the seriousness of the charge and defendant's detention were inappropriate.

At another point, in explaining that some exhibits may have been marked for identification during trial but not admitted into evidence, the judge told the jury that was done "so that a higher court will know what we were all talking about here. " The judge's comment was unnecessary and improper. See State v. Brown, 138 N.J. 481, 537 (1994) ("A jury should not be reminded of the potential for appellate review, because that prospect may diminish the jury's sense of responsibility for its decision and might encourage the jury to render a verdict based on a lesser degree of certainty than required"), overruled on other grounds by State v. Cooper, 151 N.J. 326 (1997).

However, given the strength of the State's evidence, none of these remarks raises a reasonable doubt that they led the jury to a verdict it otherwise would not have reached.

A-3934-18

## C.

After the State rested, defendant sought to admit into evidence two photographs of Mansfield Johnson wearing dreadlocks and dark rimmed glasses with a gold design, and another where he is standing next to defendant and wearing dark rimmed glasses without dreadlocks. The prosecutor objected because the photographs were not properly authenticated, were irrelevant, and defendant failed to supply notice he intended to assert third-party guilt as an affirmative defense.

Defense counsel argued the photographs were relevant because Hendrix allegedly initially described the shooter as having dreadlocks, Mansfield Johnson was wearing the same dark rimmed glasses in the photograph as those found at the VFW, and defendant had a constitutional right to suggest he was not responsible for the crime.

The judge sustained the objection, finding the photographs did not go "to the heart of proving any relevant material fact in this case" and only showed that at one point "Money Mike" had dreadlocks and at another point he did not. The judge reasoned, "It's not Money Mike that we're concerned with in terms of identification. We are concerned with the identification of [defendant] in this case."

35

The United States Constitution and the New Jersey Constitution "guarantee criminal defendants 'a meaningful opportunity to present a complete defense.'" State v. Handy, 215 N.J. 334, 350 (2013) (quoting State v. Garron, 177 N.J. 147, 168 (2003)). "The constitutional right to present a defense confers on the defendant the right to argue that someone else committed the crime." State v. Fortin (Fortin II), 178 N.J. 540, 590 (2004) (citing State v. Jiminez, 175 N.J. 475, 486 (2003)). "Evidence in support of third-party guilt, or any theory offered by the prosecution or defense, must satisfy the standards of the New Jersey Rules of Evidence." Id. at 591. "[O]rdinarily . . . an accused is entitled to advance . . . any evidence which may rationally tend to refute his guilt or buttress his innocence of the charge made." State v. Garfole, 76 N.J. 445, 453 (1978).

"We defer to [the] trial court's evidentiary ruling absent an abuse of discretion." Garcia, 245 N.J. at 430 (citing State v. Nantumba, 221 N.J. 390, 402 (2015)). However, "where the trial court fails to apply the proper legal standard in evaluating the admissibility of evidence, we review the ruling de novo." State v. Trinidad, 241 N.J. 425, 448 (2020).

On appeal, defendant contends the judge applied the wrong standard in excluding the photographs of Mansfield Johnson wearing "the Chanel glasses."

Contrary to the position taken at trial, defendant contends the "evidence was proffered . . . to negate [defendant's] ownership of the glasses, not necessarily third-party guilt." We find no error.

"Relevant [e]vidence" is defined under N.J.R.E. 401 as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." "In criminal matters, relevance from the prosecution's standpoint is generally determined by the substantive elements of the offense, while relevance from the defendant's perspective depends on both the elements of the offense and the prosecution's method of proving those elements (e.g., confessions, witness's testimony, circumstantial evidence)." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 4 on N.J.R.E. 401 (2022-2023).

Moreover, "[u]nlike the plaintiff and the defendant in a civil case, . . . the defendant and the prosecution in a criminal case are not on equal footing. The defendant's constitutional right to present a defense affects the definition of 'relevant evidence.'" Ibid. Therefore, "[w]hile the prosecution must make the traditional showing of tendency to make a fact of consequence more probable than not, a defendant need show only that the evidence offered has a rational

tendency to engender a reasonable doubt about an essential element of the State's case." Ibid.

The State bore the burden of proving defendant was the shooter at the VFW hall. To that end, the State introduced evidence that the shooter wore black rimmed eyeglasses and defendant's DNA was found on eyeglasses matching that description found at the VFW. That Mansfield Johnson had at some undisclosed point in time worn black rimmed eyeglasses does not cast doubt on the State's proofs. There is no evidence that the eyeglasses in the photographs were the same eyeglasses found at the VFW, or that they are Chanel eyeglasses. And there was evidence that other men in the VFW that night wore similar black rimmed eyeglasses. Indeed, that was a point stressed by defense counsel in cross-examination.

Further, although Hendrix said that Mansfield Johnson was in the VFW that night, there was no evidence he wore the eyeglasses that carried defendant's DNA. In short, the photographs showing Mansfield Johnson wearing black rimmed eyeglasses at some unknown point in time had no rational tendency to

engender a reasonable doubt about an essential element of the State's case, i.e., defendant's identity as the shooter.[12]

D.

In Point V, defendant contends the judge erred in admitting the recording of the jailhouse call and the expert testimony of Detective Whitham. Specifically, defendant argues: the State failed to provide proper notice under Rule 3:10-3; Whitham should not have been permitted to testify because he was an investigating officer; and the evidence was inadmissible and highly prejudicial under N.J.R.E. 404(b). We disagree.

On the first day of trial, defense counsel objected to the admission into evidence of three jail calls by defendant under N.J.R.E. 404(b), and because she had not received notice that the State was intending to call an expert "in slang." The judge reviewed the transcripts of the calls and in an oral decision admitted the call that included the slang words "wifey" and "jawn" into evidence, but he

---

[12] Moreover, we agree the evidence was properly excluded on the theory proffered at trial of third-party guilt. "[W]hen a criminal defendant seeks to cast blame on a specific third-party, he or she must notify the State in order to allow the State an opportunity to properly investigate the claim." State v. Cotto, 182 N.J. 316, 334 (2005) (citing State v. Loftin, 146 N.J. 295, 345–46 (1996)). Defendant did not notify the State prior to trial and did not move to admit the photographs until after the State had rested.

barred the other two calls. The judge found the call was relevant and the probative value was not outweighed by any prejudice. Further, the judge rejected the argument that this evidence was about an uncharged crime in violation of N.J.R.E. 404(b). The judge also found an expert witness was necessary to address the slang words used in the call and ordered the State to provide defendant with an expert's report. The State delivered a copy of Whitham's report after the jury was selected but before the first witness was called.

In a subsequent oral opinion, the judge concluded the State failed to comply with the discovery requirement of Rule 3:13-3(b)(1)(I), but defendant was not prejudiced by the late submission. The judge permitted Whitham to testify about the meaning of the slang terms but barred him from offering any opinions about defendant's motivation.

Rule 3:13-3(b)(1)(I) provides the State shall provide a defendant with the

> names and addresses of each person whom the prosecutor expects to call to trial as an expert witness, the expert's qualifications, the subject matter on which the expert is expected to testify, a copy of the report, if any, of such expert witness, or if no report is prepared, a statement of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. Except as otherwise provided in R. 3:10-3, if this information is not furnished [thirty] days in advance of trial, the expert witness may, upon

> application by the defendant, be barred from testifying at trial.

And <u>Rule</u> 3:10-3(a) provides that:

> Whenever the State intends to call an expert witness to testify at trial . . . the State shall serve written notice upon the defendant and counsel of intent to call that witness, along with a proffer of such testimony, all reports pertaining to such testimony, and any underlying tests, at least [twenty] days before the pretrial proceeding begins, or at least [twenty] days before the pretrial conference. If extenuating circumstances exist, the [S]tate may file the notice after this deadline.

"The decision on whether to bar an expert's testimony . . . is left to the trial court's discretion." <u>State v. LaBrutto</u>, 114 N.J. 187, 205 (1989). "Factors that should result in permitting the expert to testify include '(1) the absence of any design to mislead, (2) the absence of the element of surprise if the evidence is admitted[,] and (3) the absence of prejudice which would result from the admission of evidence.'" <u>Ibid.</u> (quoting <u>Amaru v. Stratton</u>, 209 N.J. Super. 1, 11 (App. Div. 1985)). Here, we substantially agree with the trial court's reasons for admitting the evidence despite the State's technical violation of the <u>Rules</u>.

Defense counsel objected to Whitham testifying as an expert because he was involved in the investigation of the shooting, and it would suggest to the jury Whitham had some underlying knowledge of defendant. The judge

overruled the objection but cautioned the jury that no inference could be drawn from Whitham's testimony that defendant had engaged in gang activity or anything else.

In State v. Hyman, we held that an expert may testify about "drug slang or code words [that] remain beyond the average juror's understanding." 451 N.J. Super. 429, 446 (App. Div. 2017). The Court has recognized that "the risk of undue prejudice could be 'significant if the expert witness is one of the investigating officers and also offers an opinion on an ultimate issue in the case.'" State v. McLean, 205 N.J. 438, 454 (2011) (quoting State v. Berry, 140 N.J. 280, 301 (1995)). Nonetheless, in Hyman, we rejected the "defendant's categorical argument that [the witness] would have been disqualified as an expert witness because he also testified as the lead investigator in the case," 451 N.J. Super. at 454, finding that "the Court has not imposed an absolute ban on such dual roles," Ibid. (citing State v. Torres, 183 N.J. 554, 580 (2005)). Instead, "the trial court has discretion 'where appropriate, to limit the scope of such testimony.'" Id. at 455 (quoting Torres, 183 N.J. at 580).

Here, the judge did not mistakenly exercise his discretion by allowing Whitham to testify as an expert witness in "slang." The judge provided a cautionary limiting instruction to the jury before Whitham's testimony and gave

42

additional appropriate instructions in his final charge. Whitham's qualification as an expert in slang did not imbue his factual testimony with greater weight, nor did he ever express an opinion about an ultimate issue in the case.

Lastly, defendant argues the judge erred in admitting the recorded jail call because it was not relevant under N.J.R.E. 401 and highly prejudicial under N.J.R.E. 403 and N.J.R.E. 404(b). The argument requires little comment.

"Relevancy is the hallmark of admissibility of evidence." State v. Williams, 240 N.J. 225, 235 (2019) (quoting State v. Darby, 174 N.J. 509, 519 (2002)). Evidence is relevant if it tends "to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. As the State argued below and the judge found, defendant called Mansfield Johnson shortly after the shooting to ask whether police had found a gun, and that evidence had a tendency in reason to establish that defendant had used the gun to shoot Peterson and Matthews. See State v. Ricks, 326 N.J. Super. 122, 129 (App. Div. 1999) (State need not show the particular weapon offered into evidence is the one that was used in the crime; the weapon is admissible if some connection to the crime can be shown (first citing State v. Mayberry, 52 N.J. 413, 435 (1968); and then citing Commonwealth v. Spotz, 716 A.2d 580, 590 (Pa. 1998))). Here, the proximity of the phone call to the shooting, the failure of the investigation

to result in finding the weapon, and defendant's expressed concern that police had found a gun, established the relevancy of the evidence.

This also defeats defendant's claim that the recorded call was inadmissible N.J.R.E. 404(b) evidence of uncharged crimes. Simply put, intrinsic evidence "is distinguishable from 'other crimes' evidence under Rule 404(b) because it is not evidence of another crime; it directly proves the charged offense." State v. B.A., 458 N.J. Super. 391, 412 (App. Div. 2019) (citing State v. Rose, 206 N.J. 141, 177 (2011)).

Our decision on the above issues makes it unnecessary to consider defendant's claim in Point VII of cumulative error requiring reversal.

We affirm defendant's convictions.

IV.

Defendant contends the imposition of two consecutive maximum terms of ten years' imprisonment subject to NERA was excessive. We do not necessarily agree, however, the Court has specifically cautioned "against the imposition of multiple consecutive maximum sentences unless circumstances justifying such an extraordinary overall sentence are fully explicated on the record." State v. Randolph, 210 N.J. 330, 354 (2012). Moreover, since this case was tried and the sentence imposed, the Court has required a sentencing judge to provide "[a]n

explicit statement, explaining the overall fairness of a sentence imposed on a defendant for multiple offenses." Torres, 246 N.J. at 268 (citing State v. Miller, 108 N.J. 112, 122 (1987)).

We remand the matter to the trial court to reconsider the overall sentence imposed. The "court should view defendant as he stands before the court" at that time. Randolph, 210 N.J. at 354. We express no opinion as to an appropriate sentence.

Affirmed and remanded for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3934-18